*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0291P (6th Cir.)
File Name: 04a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

THE UNITED CHURCH OF
CHRIST; RONALD FUJIYOSHI;
GARY QUARLES; JUAN
REYNA,
    *Plaintiffs-Appellants,*

AMERICAN MISSIONARY
ASSOCIATION, et al.,
    *Plaintiffs,*

*v.*

GATEWAY ECONOMIC
DEVELOPMENT CORPORATION
OF GREATER CLEVELAND,
INC.,
    *Defendant-Appellee.*

No. 01-3434

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00661—Kathleen McDonald O'Malley,
District Judge.

Argued: September 11, 2002

Decided and Filed: September 1, 2004

---

Before: BOGGS, Chief Judge; COLE, Circuit Judge;
BATTANI, District Judge.*

———————

**COUNSEL**

**ARGUED:** Raymond Vasvari, AMERICAN CIVIL
LIBERTIES UNION OF OHIO FOUNDATION, Cleveland,
Ohio, for Appellants. Dennis R. Wilcox, CLIMACO,
CLIMACO, SEMINATORE, LEFKOWITZ & GAROFOLI,
Cleveland, Ohio, for Appellee. **ON BRIEF:** Raymond
Vasvari, AMERICAN CIVIL LIBERTIES UNION OF OHIO
FOUNDATION, Cleveland, Ohio, for Appellants. Dennis R.
Wilcox, CLIMACO, CLIMACO, SEMINATORE,
LEFKOWITZ & GAROFOLI, Cleveland, Ohio, for Appellee.

———————

**OPINION**

———————

R. GUY COLE, JR., Circuit Judge. The Indians and
Cavaliers—Cleveland's respective professional baseball and
basketball teams—play their home games at the Gateway
Sports Complex ("the Complex"). Featuring Jacobs Field and
Gund Arena, the respective stadiums for each team, along
with a parking garage and a common area, the Complex hosts
tens of thousands of visitors on a regular basis. One group of
would-be visitors, Plaintiffs United Church of Christ and its
companions (collectively, "UCC") appeal the denial of a
requested injunction that would allow them to gather and
demonstrate at the Complex. The district court held that:
(1) even if the privately owned Complex were treated as if it

---

    *The Honorable Marianne O. Battani, United States District Judge
for the Eastern District of Michigan, sitting by designation.

were owned by the state, the areas in which UCC sought to protest would be nonpublic fora; and (2) the restrictions on UCC's access were reasonable. For the following reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND**.

## I. BACKGROUND

On April 14, 2000, the Cleveland Indians played their first home game of the season. UCC planned to attend the game to protest the team's use of the nickname "Indians" and the cartoon-character mascot "Chief Wahoo," trademarks that UCC considers to be racist and offensive to Native Americans. Specifically, UCC planned to conduct its demonstrations on the Gateway Sidewalk and the Gateway Common areas ("Commons").

The Complex is owned by a private entity, the Gateway Economic Development Corporation of Greater Cleveland, Inc. ("Gateway"), which excludes all persons from using the Gateway Sidewalk or the Commons to solicit, advertise, or protest (save for three exceptions unimportant to our resolution of this case). On March 10, 2000, UCC filed suit against Gateway in the United States District Court, Northern District of Ohio, arguing that the First Amendment mandated a preliminary and permanent injunction allowing UCC to protest on both the Gateway Sidewalk and the Commons on opening day. On April 13, 2000, the district court refused to preliminarily enjoin Gateway's restrictions, and on March 22, 2001, after UCC amended its complaint, the district court denied UCC's request for a permanent injunction. UCC timely appealed.

## II. ANALYSIS

The district court declined to decide whether Gateway was a state actor, holding that even if it were, the Gateway Sidewalk and the Commons constituted non-public fora subject to reasonable access restrictions. We review the

district court's legal conclusions anew and its factual determinations for clear error. *Adland v. Russ*, 307 F.3d 471, 477 (6th Cir. 2002).

### A. *Public Forum*

UCC first challenges the district court's determination that neither property at issue constituted a public forum. We employ "forum analysis as a means of determining when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004) (internal quotations omitted). There are three types of fora: (1) the traditional public forum; (2) the designated public forum; and (3) the nonpublic forum. *Id.* UCC argues that the Gateway Sidewalk is a traditional public forum, and that the Commons are designated public fora.

### 1. Sidewalk

The Gateway Sidewalk encircles the Complex, and looks and feels like a typical public sidewalk. Because the Supreme Court has explained that from "[t]ime out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum," *Frisby v. Schultz*, 487 U.S. 474, 480 (1988), UCC argues that the Gateway Sidewalk is a traditional public forum, a place in which the "right to limit protected expressive activity is sharply circumscribed." *Chabad of S. Ohio v. City of Cincinnati*, 363 F.3d 427, 434 (6th Cir. 2004) (internal quotations omitted).

There are two key reasons why UCC is correct. First, the Gateway Sidewalk blends into the urban grid, borders the road, and looks just like any public sidewalk. Indeed, a public sidewalk—which runs parallel to the Gateway Sidewalk—circumscribes the Complex and borders the

municipal streets. Further, the public and Gateway sidewalks are made of the same materials and share the same design. In *United States v. Grace*, 461 U.S. 171, 180 (1983), the Supreme Court held that a sidewalk bordering the Supreme Court constituted a public forum because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *See also Venetian Casino Resort v. Local Joint Executive Bd. of Las Vegas*, 257 F.3d 937, 947 (9th Cir. 2001) (applying First Amendment to privately owned sidewalk that "is connected to and virtually indistinguishable from the public sidewalks to its north and south"); *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992) ("The two sidewalks here appear to be classic instances. They are physically indistinguishable from ordinary sidewalks used for the full gamut of urban walking."). Moreover, although in some areas the Gateway Sidewalk's border is roughly delineated by fifteen-foot-long planter boxes containing trees, this fact does not alter our conclusion. As the district court rationally determined, the average observer would be unfamiliar with the geographic significance of this sporadic vegetation.

Second, like its publicly owned counterparts, the Gateway Sidewalk also is a public thoroughfare. By design, the Gateway Sidewalk contributes to the City's downtown transportation grid and is open to the public for general pedestrian passage. Indeed, rather than leading to the rest of the Complex, the Gateway Sidewalk encircles it as a through route. Although Gateway contends that the majority of the Gateway Sidewalk's pedestrians are traveling to and from Indians and Cavaliers games, "[t]he mere fact that a sidewalk abuts property dedicated to purposes other than free speech is not enough to strip it of public forum status." *Henderson*, 964 F.2d at 1182.

Of course, not all sidewalks are public fora. *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720 (1990) (postal service sidewalk separated from main highway sidewalk and could be used only to enter the post office); *Greer v. Spock*, 424 U.S. 828 (1976) (sidewalks located in an enclosed military base and separated from the streets and sidewalks of the city itself); *Chicago Acorn v. Metro. Pier and Exposition Auth.*, 150 F.3d 695, 702 (7th Cir. 1998) ("Rather than being part of the city's automotive, pedestrian, or bicyclists' transportation grid, the sidewalks on the pier and the service street on its north side are internal to the pier, like the sidewalks, streets, and parking lots in Disney World[.]"). Whether a given sidewalk is considered a public forum, of course, hinges on a case-by-case inquiry in which no single factor is dispositive. The Gateway Sidewalk differs from those sidewalks that have not been held to be public fora because it is fully integrated into the downtown and indistinguishable from its adjoining publicly owned sidewalk both physically and in its intended use.

2.   Commons

Although UCC concedes that the Commons—an assortment of plazas, grassy areas, and interior streets within the Complex—are not traditional public fora, it argues that they have been designated as public fora by Gateway. The government (or in this case, Gateway, who we assume, for purposes of this question, stands in the government's shoes) may designate "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 802 (1985).

UCC's argument turns on one fact: that although it generally prohibits access to the Commons during gametime, "Gateway has allowed as many as one hundred unticketed fans at a time to congregate along Eagle Avenue, behind the

stadium bleachers." This, along with the fact that fans on their way to and from the games "routinely carry signs and banners supportive of the Cleveland Indians across the common areas and even into the stadium without interference from Gateway personnel," indicates to UCC that Gateway has opened up the Commons to the gamut of public expression. The record reveals, however, that to the extent that Gateway has allowed non-ticketholders to access the Commons during gametime, it has done so only for those interested in the actual game being played, and has done so for the specific purpose of contributing to the gametime ambience.

First, the handful of non-ticketed Indians fans who are allowed access to the Commons are so allowed because they have an interest in the Indians' performance on the field. Second, although the Indians have sometimes allowed radio stations to use the plaza area to broadcast high-profile games, this again directly furthers fan enjoyment of the game itself. UCC, in marked contrast, does not seek access to the Commons for purpose of fan enjoyment. Rather, it wishes to make a political statement that is merely incidental to the game itself. That Gateway has allowed baseball fans access to the Commons falls far short of suggesting that it has allowed everyone access to the Commons.

Thus, we agree with the district court that the Commons are not designated public fora. Moreover, UCC did not challenge the district court's conclusion that if they are nonpublic fora, the restrictions on their use are reasonable. Accordingly, even if Gateway were treated as a state actor for purposes of the Commons, the restrictions on their usage would satisfy the First Amendment.

## B.    State Action

Although UCC argues that a finding that the Gateway Sidewalk is a public forum requires that we remand the case to the district court "for findings regarding the state-actor

status of the Gateway Corporation," our decision that the Gateway Sidewalk is a public forum necessarily requires that the Sidewalk be treated as state owned for the purposes of the First Amendment. The following analysis explains why.

Before the district court, UCC advanced three independent reasons why the First Amendment applied to Gateway. Two of these arguments had little to do with the character of the Complex itself; rather, they focused on the relationship between Gateway and the City, and, if accepted, would lead to the conclusion that for all practical purposes, the Complex is publicly owned. First, relying on *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995), in which the Supreme Court held that Amtrak was an instrumentality of the government, UCC argued that "because like Amtrak, its history, mandate and leadership are so tied up with the government—in this case the City and the County—that [Gateway] should be deemed an agency or instrumentality of local, and therefore state government." Second, in a similar vein, UCC argued that "the relationship between the Gateway Corporation, the City and the County is so deeply symbiotic as to make the Gateway Corporation a state actor." Both of these arguments turned on the amount of control exercised over by the Complex by the state—a subject that has been detailed in other cases, *see N. Ohio Chapter of Associated Builders & Contractors, Inc. v. Gateway Econ. Dev. Corp.*, 1992 WL 119375 (N.D. Ohio May 12, 1992), but upon which the record in our case is largely silent. Thus, we agree that a determination of whether Gateway is a state actor under these two tests would require a remand to the district court for additional findings.

But the third justification that UCC advanced to apply the First Amendment to Gateway was that "in managing access to the sidewalks, malls and plazas of the Gateway Complex, the Gateway Corporation is performing a function that is traditionally the exclusive prerogative of the state." This inquiry—the so-called "public function test"—is not satisfied

when a private actor merely holds its property out to the public. *See Hudgens v. NLRB*, 424 U.S. 507 (1976) (First Amendment does not apply to privately-owned shopping center); *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) (same). Rather, we ask whether the "private entity exercise[s] powers which are traditionally exclusively reserved to the state." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). Examples of such public functions have included the operation of a park that is public in character, *see Evans v. Newton*, 382 U.S. 296, 302 (1966) ("[T]he public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law."), and the running of a company town that functions as if municipally-controlled, *see Marsh v. Alabama*, 326 U.S. 501, 507 (1946) ("Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free.").

The particular "public function" that UCC asserts in our case is the regulation of the public's access to a sidewalk that functions as a public sidewalk—in other words, the operation of a public forum. Because—owing to the fact that it sits in the heart of the City, is connected and indistinguishable from a publicly-owned sidewalk, and is open to the public as a through route—the Gateway Sidewalk constitutes a public forum, Gateway's operation therein serves as a public function. *See Lee v. Katz*, 276 F.3d 550, 555 (9th Cir. 2002) ("The particular public function that the plaintiffs allege the [defendant] performed was the regulation of free speech within the Commons, a public forum. Previous courts have found this function to be a traditional and exclusive public function."); *Venetian Casino*, 257 F.3d at 943 (9th Cir. 2001) (stating that "[t]he issue before us is whether the sidewalk on private property that requires unobstructed pedestrian traffic is a public forum," and proceeding to determine that because the privately owned sidewalk was a public forum, the First

Amendment applied); *Rouse v. City of Aurora*, 901 F.Supp. 1533, 1535-36 (D. Colo. 1995), (evaluating plaintiffs' claim that the First Amendment applied to a privately owned shopping center sidewalk, and observing that "[t]he linchpin to this claim, and, indeed, to plaintiffs' case theory underlying all claims in this action, is their allegation that the Granada Park Shopping Center is a public forum"); *cf. Citizens to End Animal Suffering & Exploitation v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 70-72, 76 & n.30 (D. Mass 1990) (treating public function and public forum inquiries as technically distinct, but applying identical factors to both decisions).

Thus, for the purpose of this case, we need not decide whether Gateway is a state actor under the other two theories advanced by UCC: our decision in today's case has no bearing, for instance, on whether, Gateway's employees would receive First Amendment protection for their workplace speech or whether Gateway would have to comply with the Due Process Clause when firing a subcontractor. Rather, our holding today means only that Gateway is a public actor when performing the public function of regulating the public's access to the Gateway Sidewalk.

## C.   Time, Place, and Manner Restriction

Because the Gateway Sidewalk is a public forum, Gateway may saddle it only with content-neutral time, place, and manner restrictions that are narrowly tailored to further a significant governmental interest and reserve sufficient alternative avenues of communication. *See Chabad*, 363 F.3d at 434. In light of the highly fact-bound nature of the time, place, and manner analysis and the limited briefing we have received on the question, we remand to the district court to consider this question in the first instance. *See Lee*, 276 F.3d at 557.

### III.  CONCLUSION

The district court's judgment **AFFIRMED** in part and **REVERSED** in part.  We **REMAND** for the district court to consider whether the restrictions on access to the Gateway Sidewalk satisfy the standards applicable to traditional public fora.