# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3210

_____

Larry Ball

*Plaintiff - Appellant*

v.

City of Lincoln, Nebraska

*Defendant - Appellee*

Chris Buetler, Mayor of the City of Lincoln; James Peschong, Lincoln Chief of Police

*Defendant*s

SMG, a Pennsylvania General Partnership

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: March 8, 2017
Filed: August 29, 2017

_____

Before WOLLMAN, MELLOY, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Larry Ball appeals from the district court's[1] order granting summary judgment to the City of Lincoln, Nebraska (City), and SMG (collectively, Appellees) on his claim that the Appellees violated his First Amendment free-speech rights.[2] Ball was ticketed and arrested for trespassing after he distributed leaflets in the plaza area of the Pinnacle Bank Arena (Plaza Area), which activity was prohibited by the Arena's Exterior Access and Use Policy (Policy). Ball argues that the district court erred in concluding that the Plaza Area is a nonpublic forum and that the Policy is a reasonable restriction on speech. We affirm.

"We review a grant of summary judgment *de novo* and will affirm when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Grant v. City of Blytheville, 841 F.3d 767, 770 (8th Cir. 2016) (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Torgerson, 643 F.3d at 1042. The nonmoving party "may not rely on allegations or denials," however, but must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation [or] conjecture." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). Even if some factual dispute exists, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In other words, there is no genuine issue for trial if "the record taken as a whole could not lead a rational trier of fact to

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

[2]The district court dismissed with prejudice Ball's claims against Chris Buetler, the City Mayor, and James Peschong, the City Chief of Police, and Ball does not appeal from that order.

find for the nonmoving party." Torgerson, 643 F.3d at 1042. We relate the facts in light of these standards.

## I. Background

In 2010, the City and the University of Nebraska (University) entered into an agreement to create the West Haymarket Joint Public Agency (Agency), which was formed to facilitate the redevelopment of the City's West Haymarket district. The redevelopment plan included the construction of the Pinnacle Bank Arena (Arena), a large, modern sports and entertainment venue. The redevelopment plan included several parking garages to the west and south of the Arena; a festival space/surface parking lot to the north of the Arena; a pedestrian bridge connecting the festival space and parking lots to the Arena; and new roads, streets, and sidewalks providing access to all these facilities. Among its other uses, the Arena was to function as the home court for the University's basketball teams. It was built to replace the City's fifty-year-old Pershing Center, which had been operated by SMG for more than a decade until its closing in 2014. Under the redevelopment plan, the City would own the Arena and its associated improvements and facilities for the benefit of the City's residents and citizens.

The City entered into a Facilities Agreement with the Agency, under which the City would construct the Arena and related facilities, including the adjacent roads, streets, and sidewalks, and would thereafter operate, maintain, and manage them. Construction of new roads, streets, and sidewalks adjacent to the Arena was necessary because, prior to its redevelopment, the site had been occupied by railroad tracks, which were relocated to accommodate the Arena and related facilities. The City also entered into a Management Agreement with SMG, granting SMG the "exclusive right to manage, market, promote and operate" the Arena and related facilities. The Arena opened in the fall of 2013.

The Policy, which SMG adopted in October 2014, includes diagrams of the Arena area and governs exterior access and use of the Arena and related facilities. The Policy and diagrams were then posted on the Arena's website, and paper copies were made available to the public. The Policy was consistent with the unwritten access and use policy that SMG had been enforcing since the Arena's opening and which SMG had earlier enforced at the Pershing Center from 1996 until its closing in 2014. The Policy's purpose was to provide Arena patrons—sometimes as many as 15,000 at a single event—safe and efficient access to the Arena and related facilities, as well as to allow for the full use of the Arena by the performers, sports teams, trade shows, conventions, and others who leased the Arena for various events (Arena Tenants). Certain exterior areas around the Arena and related facilities were designated by the Policy as "nonpublic forum areas" and were specifically reserved for use by Arena Tenants and their authorized productions and affiliates (Policy Zone). The Policy Zone, which was defined in the text and depicted on the diagrams accompanying the Policy, included the Plaza Area—the exterior plaza located at the southeast corner of the Arena property near the southeast doors to the Arena. The Policy and accompanying diagrams also provided for and identified public areas outside the Policy Zone. The Policy Zone did not include the pedestrian bridge or a path running along the eastern edge of the Plaza Area from the bottom of the pedestrian bridge to the adjacent public sidewalk.



*Image of the Plaza Area located at the southeast corner of the Policy Zone. The perimeter of the Plaza Area is indicated in black for ease of reference, although it is shown in orange in the City's Supplemental Appendix. Suppl. App. at 24.*

Ball, a citizen and resident of the City, passes out leaflets containing Christian messages to members of the public. Ball has handed out leaflets near the Arena on at least four occasions. On March 15, 2014, the boys' state high school basketball tournament was being held at the Arena. Ball handed out leaflets to tournament attendees while standing in the Plaza Area, at times standing directly in front of the doors to the Arena. SMG staff approached Ball several times and asked him to move from the Plaza Area to the adjacent public sidewalk. Ball agreed to leave but stated that he would return later to continue leafletting. Ball returned that afternoon and began leafletting again in the Plaza Area. When Ball refused to move from the Plaza Area, SMG staff called the Lincoln Police Department. The officers asked Ball to move to the public sidewalk outside the Plaza Area. Ball refused to move, asserting that he had a right to leaflet in the Plaza Area. Ball was arrested and cited for trespassing in violation of the unwritten Arena use policy and for refusing to comply

with the officers' directives to move to another location. The charges were later dismissed.

Ball returned to the Arena on March 5, 2015, to hand out leaflets to people attending the girls' state high school basketball tournament and again stood in the Plaza Area roughly 15 to 25 feet from the Arena doors. Ball concedes that he had by that time read the written Policy and knew that it prohibited his leafletting activity. Officers again cited Ball for trespassing but did not arrest him. Ball returned to the Plaza Area on March 7, 2015, engaged in the same conduct, and was again cited for trespassing in violation of the Policy but was not arrested. During the second weekend of March 2015, Ball distributed leaflets outside the Arena during the boys' state high school basketball tournament, but this time he remained on the public sidewalk outside the Plaza Area and was not approached by SMG staff or ticketed. In July 2015, Ball was found guilty of trespassing for the citations issued on March 5 and 7, 2015, and was fined $50 for each violation. The Lincoln Police Department has not cited any other individual for trespassing or for other criminal violations related to the Policy.

Ball filed this lawsuit on March 12, 2015, alleging that the City and SMG had violated his First Amendment free-speech rights by issuing the March 2014 and March 2015 citations for trespassing on the Plaza Area in violation of the Policy. Ball sought permanent injunctive relief and monetary damages. The district court granted summary judgment in favor of the City and SMG, concluding that the Plaza Area was a nonpublic forum for purposes of the First Amendment and that the Policy was a reasonable restriction on speech, conclusions that Ball challenges on appeal.

## II. Discussion

The First Amendment provides that state actors "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; amend. XIV. The Appellees are state actors for purposes of the First Amendment, see Brentwood Acad. v. Tenn.

Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-98 (2001), and the leafletting at issue here is within the scope of speech protected by the First Amendment, see Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 677 (1992).  The First Amendment does not, however, provide Ball with unfettered latitude to engage in leafletting wherever and whenever he might choose.  Instead, the "government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" United States v. Grace, 461 U.S. 171, 178 (1983) (quoting Adderly v. Florida, 385 U.S. 39, 47 (1966)).  Indeed, it is "well settled that the government need not permit all forms of speech on property it owns and controls." Lee, 505 U.S. at 678.  This is so because "[n]othing in the Constitution requires the [g]overnment freely to grant access to all who wish to exercise their right to free speech on every type of [g]overnment property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799-800 (1985); see also United States v. Kokinda, 497 U.S. 720, 725 (1990) (noting that while the government is subject to certain constraints in its ability to control access to its property, "the [g]overnment's ownership of property does not automatically open that property to the public").  While the government is generally permitted to exercise control over expressive activities on its property, the constitutionally permissible extent of that control turns on the nature of the property involved and the restrictions imposed. See Cornelius, 473 U.S. at 797.  The Supreme Court "has adopted a forum analysis as a means of determining when the [g]overnment's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Id. at 800; see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983); Minn. Majority v. Mansky, 708 F.3d 1051, 1056 (8th Cir. 2013).  In other words, "the extent to which the [g]overnment can control access depends on the nature of the relevant forum." Kokinda, 497 U.S. at 726 (quoting Cornelius, 473 U.S. at 800).

A traditional public forum is public property that has "traditionally been available for public expression," Lee, 505 U.S. at 678, and "the free exchange of ideas," Cornelius, 473 U.S. at 800. The "quintessential" examples of such traditional public forums are streets, sidewalks, and public parks, because these venues "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry Educ. Ass'n, 460 U.S. at 45 (citation omitted). "A traditional public forum is a type of property that 'has the physical characteristics of a public thoroughfare, . . . [that has] the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, [and that has] historical[ly] and traditional[ly] . . . been used for expressive conduct.'" Bowman v. White, 444 F.3d 967, 975 (8th Cir. 2006) (citation omitted). A "designated" public forum, as the name implies, is created when the government "intentionally open[s] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802. "Although [the government] is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." Perry Educ. Ass'n, 460 U.S. at 46. In a traditional or designated public forum, "the government's ability to permissibly restrict expressive conduct is very limited." Grace, 461 U.S. at 177. The government may impose a content-based restriction on speech only if the restriction "is necessary to serve a compelling state interest and . . . is narrowly drawn to achieve that end." Perry Educ. Ass'n, 460 U.S. at 45. The government may impose a content-neutral time, place, and manner restriction on speech as long as such restriction is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." Id.

A nonpublic forum is government property that "is not by tradition or designation a forum for" expressive activities by the public. Id. at 46. The government retains much broader discretion to restrict expressive activities in a nonpublic forum. The government "may reserve [a nonpublic] forum for its intended

purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id.; see also Hodge v. Talkin, 799 F.3d 1145, 1153 (D.C. Cir. 2015) (noting that the government "enjoys significantly greater latitude to regulate expressive activity" in a nonpublic forum, "including the ability 'in some circumstances' to 'ban the entry . . . of all persons except those who have legitimate business on the premises'" (quoting Grace, 461 U.S. at 178)). A restriction on expressive activity in a nonpublic forum "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation" to be constitutionally permissible. Kokinda, 497 U.S. at 730.

Ball argues that the district court erred in concluding that the Plaza Area is a nonpublic forum. He first contends that because the Plaza Area is physically and spatially indistinguishable from the adjacent pedestrian bridge and other public sidewalks, it is, "without more," a traditional public forum. See Grace, 461 U.S. at 177 (noting that public venues such as sidewalks that have been "historically associated" with expressive activities "are considered, without more, to be 'public forums'"). In determining whether government property constitutes a traditional public forum, however, the physical appearance of the property is only one of the factors we must consider. See Kokinda, 497 U.S. at 727 ("The mere physical characteristics of the property cannot dictate forum analysis."); see also Bowman, 444 F.3d at 978. We must also take into account "the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property, not merely its physical characteristics and location." Id. In addition, we must consider "the presence of any special characteristics regarding the environment in which" the area in question exists. Id. No single factor is dispositive. Id. at 978 n.6.

A. Physical Characteristics of the Plaza Area

Several courts have considered the physical characteristics of a venue in determining its forum status. In Grace, the Supreme Court considered whether the "public sidewalks surrounding the [United States Supreme] Court building" were traditional public forums for purposes of the First Amendment. 461 U.S. at 175, 178. The Court concluded that these sidewalks, which marked the perimeter of the Court grounds, were "indistinguishable from any other sidewalks in Washington, D.C.," particularly noting that there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb" and onto the sidewalks that "they [had] entered some special type of enclave." Id. at 179-80. Thus, the Court explained, there was "no reason why [these sidewalks] should be treated any differently" from typical public sidewalks, which are "considered, generally without further inquiry, to be public forum property." Id. at 179; but see Greer v. Spock, 424 U.S. 828, 838 (1976) (holding that the streets and sidewalks within Fort Dix military base were nonpublic forums in part because they were separated from the streets and sidewalks of neighboring municipalities); Kokinda, 497 U.S. at 729-30 (holding that Postal Service sidewalk connecting post office building with parking lot was nonpublic forum). Although the Court did not directly address the status of the Court grounds, it noted that, while "publicly owned," the grounds "ha[d] not been traditionally held open for the use of the public for expressive activities." Grace, 461 U.S. at 178. The Court further observed that, even though the Court grounds were generally open to the public, they were "not transformed into 'public forum' property merely because the public [was] permitted to freely enter and leave the grounds at practically all times." Id.

In United Church of Christ v. Gateway Economic Development Corp. of Greater Cleveland, Inc., 383 F.3d 449, 452-53 (6th Cir. 2004), the Sixth Circuit concluded that the "Gateway Sidewalk" encircling a privately owned stadium and arena was a traditional public forum for purposes of the First Amendment. The court found relevant the fact that the Gateway Sidewalk "blend[ed] into the urban grid,

border[ed] the road, . . . look[ed] just like any public sidewalk," and was "made of the same materials and share[d] the same design" as the public sidewalk running alongside it. Id. at 452. That the Gateway Sidewalk's border was "roughly delineated" by large planter boxes was not determinative, because "the average observer would be unfamiliar with the geographic significance of this sporadic vegetation." Id. The fact that the Gateway Sidewalk was "fully integrated" into "the City's downtown transportation grid," just "like its publicly owned counterparts," and was physically "indistinguishable from" adjacent public sidewalks, weighed in favor of the court's holding that it was a public forum. Id. at 452-53.

In Hodge v. Talkin, 799 F.3d 1145, 1149-50 (D.C. Cir. 2015), the District of Columbia Circuit took up a question left open in Grace, namely, whether the Supreme Court plaza was a traditional public forum. The court distinguished the public sidewalks considered in Grace from the Court plaza, "the elevated marble terrace" adjacent to the public sidewalks and concluded that the plaza was a nonpublic forum for purposes of the First Amendment. Id. at 1150. The court reasoned that the "plaza's appearance and design vividly manifest its architectural integration with the Supreme Court building, as well as its separation from the perimeter sidewalks" surrounding the grounds. Id. at 1158. The court observed that the steps, walls, fountains, and floors making up the plaza were all constructed of white marble that was visually similar to the white marble of the Court building's facade and was visually distinct from the adjacent concrete sidewalks. Id. at 1151. These features, the court concluded, "convey[ed] in many distinctive ways that a person ha[d] 'entered some special type of enclave.'" Id. at 1159 (quoting Grace, 461 U.S. at 180). Thus, while there was "nothing to indicate to the public that [the] sidewalks [were] part of the Supreme Court grounds, there [was] everything to indicate to the public that the plaza [was] an integral part of those grounds." Id. (citations omitted).

Ball points to the location of the pedestrian bridge and the presence of signs displaying maps of the Haymarket district as physical features supporting a

-11-

conclusion that the Plaza Area is a public forum. Although the pedestrian bridge ends near the Plaza Area, pedestrians need not enter or pass through the Plaza Area to access other areas of the Haymarket district. Nor are they required to enter or pass through the Plaza Area to consult a district map, for one such map is posted on a sign located on the public sidewalk outside the Policy Zone. True, the pathway running along the eastern edge of the Plaza Area from the base of the pedestrian bridge to the public sidewalks adjacent to the Plaza Area—a pathway that is excluded from the Policy Zone—is not as conspicuously marked as the other borders of the Plaza Area. Were these physical features predominant, the Plaza Area might be considered a public forum. But we must also consider "the presence of any special characteristics regarding the environment in which [the Plaza Area] exist[s]," several of which distinguish the Plaza Area from the adjacent public sidewalks. See Bowman, 444 F.3d at 978.



*Partial view of the Plaza Area. The grey arrow in the left photograph shows the potential path of pedestrians exiting the pedestrian bridge. The perimeter of the Plaza Area is indicated in black for ease of reference, although it is shown in orange in the City's Supplemental Appendix. Suppl. App. at 25-26.*

Although the physical characteristics of the Plaza Area are not as dominant or distinctive as the raised and walled marble plaza leading into the Supreme Court building, several features serve to set the Plaza Area apart from its surroundings. Unlike a typical public sidewalk, the borders of the Plaza Area are curved and

irregular and are identified by conspicuous markers such as cement planters, metal stanchions or bollards, and flagpoles. The surface of the Plaza Area is composed of colored and patterned concrete, as well as by brick-like pavers, all of which generally distinguish the Plaza Area from the adjacent public sidewalks. These physical features, coupled with the general size, unique shape, and overall appearance of the Plaza Area, serve to distinguish it from the adjacent public sidewalks. Indeed, as noted by the district court, "the very presence of large public sidewalks bordering the Plaza Area signals that the Plaza Area is intended to serve a more limited function." D. Ct. Order of June 23, 2016, at 14; see Lee, 505 U.S. at 680 ("[S]eparation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction."). Thus, while a sidewalk typically maintains a consistent width, runs parallel to a public street, and blends into the urban or transportation grid, the same cannot be said of the Plaza Area. See United Church of Christ, 383 F.3d at 452 (noting that the "Gateway Sidewalk blends into the urban grid, borders the road, and looks just like any public sidewalk"); Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec., 311 F.3d 534, 550 (2d Cir. 2002) (noting that the plaza area in front of Lincoln Center performing arts complex "connects with walkways leading to surrounding streets, [but] it does not form part of the City's transportation grid in the way that traditional streets and sidewalks do"). While the physical characteristics of the Plaza Area may be suggestive of a conclusion that it is a public forum, "[t]he mere physical characteristics of the property cannot dictate forum analysis." Kokinda, 497 U.S. at 727. We therefore proceed to consider the remaining relevant factors. See Bowman, 444 F.3d at 978 (noting that we must consider property's physical characteristics, its "traditional" and "objective use[s] and purposes," and the government's "intent and policy").

## B. Use of the Plaza Area

Ball argues that, because members of the public use the pedestrian bridge and pass through the Plaza Area en route to the Haymarket district and other destinations,

-13-

the Plaza Area functions as a thoroughfare for the public to travel among and between the pedestrian bridge, the Haymarket district, and the Arena. Thus, he concludes, the Plaza Area is a public forum.

In Bowman, we noted that "streets, sidewalks, and other open areas that might otherwise be traditional public [forums] may be treated differently when they fall within the boundaries" of a university campus, because the traditional use of university property was to serve the "university's mission [of] education and the search for knowledge," to function "as a special type of enclave devoted to higher education," and not "to provide a forum for all persons to talk about all topics at all times." 444 F.3d at 978 (quotation marks and citations omitted). Similarly, in Hotel Employees, the Second Circuit held that the plaza outside the Lincoln Center performing arts complex was not a traditional public forum, despite the fact that it was used by the public to "travers[e] between surrounding streets" and to "read or eat lunch." 311 F.3d at 550. The court noted specifically that the plaza's "primary function and purpose" was to serve as the "forecourt" for the arts complex, "to facilitate patrons' passage" into the complex, and to "symbolically . . . promote the cultural arts for the benefit of the community." Id. at 551-52; cf. Gateway Econ. Dev. Corp., 383 F.3d at 452-53 (noting that, in addition to its physical characteristics, the Gateway Sidewalk was intended to be "open to the public for general pedestrian passage" as a "public thoroughfare"). The plaza "was not created primarily to operate as a public artery, [or] to provide an open forum for all forms of public expression," and "ha[d] not traditionally been available for public expression," despite the fact that "the [p]laza's design clearly invite[d] passers-by to stroll through or linger." Hotel Emps., 311 F.3d at 552 (citations omitted). The court concluded that "permitting speech on all manner of public issues in the [p]laza would compromise the City's ability to establish a specialized space devoted to . . . the arts." Id.

Here, the Plaza Area is not primarily used as thoroughfare for the public to travel among and between the pedestrian bridge, the Haymarket district, and the

-14-

Arena. Rather, it functions as a venue for commercial use by Arena Tenants, as a means to facilitate safe and orderly access to the Arena for its patrons, as a security screening area, and as a gathering place and entryway for Arena patrons. Use of the Plaza Area is specifically reserved for Arena Tenants who lease the facility, and they have used it to sell concert souvenirs and other merchandise and to set up photo booths and other exhibits. The Plaza Area is also used to facilitate the safe and efficient movement of large crowds of Arena patrons while they enter and exit the Arena. It has also increasingly been used by SMG for security screenings of Arena patrons prior to their entry into the venue. Given the recency of the Arena's construction, there is no evidence of the Plaza Area's "historic" use, but it has consistently been used as intended—commercial purposes associated with events occurring inside the Arena—since the Arena's opening in 2013. Cf. Venetian Casino Resort, LLC v. Local Joint Exec. Bd. of Las Vegas, 257 F.3d 937, 947 (9th Cir. 2001) (concluding that sidewalk relocated to private property after street-widening project remained traditional public forum in part because it had historically been used as such).

As Ball points out, the pedestrian bridge ends near the Plaza Area and non-patrons of the Arena may pass through the Plaza Area en route to other destinations. But the fact that "members of the public are permitted to come and go at will" does not transform the Plaza Area into a public forum. See Bowman, 444 F.3d at 978 (quoting Grace, 461 U.S. at 177); see also Hodge, 799 F.3d at 1160 (observing that "the Supreme Court plaza's status as a nonpublic forum is unaffected by the public's unrestricted access to the plaza at virtually any time"). Like the Lincoln Center plaza, the Plaza Area is used as the forecourt or entryway to the Arena, and it facilitates patrons' safe and efficient passage into and out of the Arena. In addition, the Plaza Area serves as additional commercial space for use by Arena Tenants. The fact that the Plaza Area, like the Lincoln Center plaza, connects to surrounding sidewalks and may be used by the general public to access those sidewalks is merely incidental to the Plaza Area's primary uses. See Hotel Emps., 311 F.3d at 550 ("The ability of

-15-

pedestrians to cross the [Lincoln Center plaza] as a short-cut between surrounding streets is merely an incidental feature of its principal function as the entrance plaza for the Lincoln Center complex."). Ball points to no evidence that the Plaza Area has been used for public expression or that it has been made available for expressive activity by the public. Accordingly, the use for which the Plaza Area was designed does not suggest that it should be considered a traditional public forum.

## C. Government Intent, Purpose, and Policy

Finally, we must also consider the City's intent, purpose, and policy to determine whether the Plaza Area is a public forum. Ball contends that the City did not intend for the Plaza Area to be a nonpublic forum because it did not enact the Policy designating it as such until after he was cited and arrested for leafletting. Granted, the City may not "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property." Grace, 461 U.S. at 180 (noting that the government "may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums" (citations omitted)). As noted above, however, there is no evidence that the City ever intended that the Plaza Area be open to the public for expressive activities or that the Plaza Area has ever been regularly used for such activities. Instead, the record establishes that the City's principal purpose with respect to the Plaza Area has been to protect the contractual rights of Arena Tenants, to allow for crowd management and safety, to provide a forecourt or gathering place for Arena patrons, and to provide an area for security screening. Although the Policy defining and outlining the Policy Zone was not initially committed to writing, the record demonstrates that the Appellees at all times intended that the Plaza Area be used in conjunction with Arena events and that opening the Plaza Area for all forms of expressive activity would be incompatible with that purpose. See Families Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs., 111 F.3d 1408, 1419 (8th Cir. 1997) (noting that lobby of local social services office was a nonpublic forum because its principal purpose was not the free exchange of ideas

but the provision of services to welfare recipients); <u>Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n</u>, 797 F.2d 552, 555 (8th Cir. 1986) (noting that Metrodome's principal purpose was to function as a sports complex and commercial venture, not to provide venue for expressive activities; fact that city allowed some advertising did not create public forum); <u>Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.</u>, 691 F.2d 155, 160-61 (3d Cir. 1982) (concluding that purpose of Meadowlands sports complex was "to bring economic benefits" to the area, not to provide a venue for expressive activity).

After considering each of the relevant factors, <i>i.e.</i>, the Plaza Area's physical characteristics; its use, function, and purpose; and the City's intent in constructing the space, we agree with the district court that the Plaza Area is a nonpublic forum. Although the Plaza Area shares some physical characteristics with a traditional public forum, there is no evidence that it has been used for expressive activities by the public. Rather, the record establishes that the Plaza Area has been used primarily in conjunction with Arena activities. Moreover, there is no evidence that the Appellees ever intended to open the Plaza Area for expressive activities by the public. Accordingly, the district court did not err in concluding that there is no genuine issue of material fact regarding the Plaza Area's status as a nonpublic forum.

D. Reasonableness of the Policy[3]

We turn then to the question whether the Policy restricting speech in the Plaza Area is permissible. "A restriction on speech in a nonpublic forum is . . . permissible

---

[3]To the extent Ball argues on appeal that the Policy violates his due-process rights, he did not raise a Fourteenth Amendment claim in his complaint, he characterized his lawsuit as a "First Amendment case" in his opposition to summary judgment, and the district court did not address any such claim. We therefore decline to address this claim raised for the first time on appeal. <u>Cf.</u> <u>Excalibur Grp., Inc. v. City of Minneapolis</u>, 116 F.3d 1216, 1223 n.5 (8th Cir. 1997) (considering a claim that was not raised in the complaint but was briefed in opposition to summary judgment because the district court addressed the claim on the merits and the opposing party did not raise an objection).

if it is viewpoint neutral and 'reasonable in light of the purpose which the forum at issue serves.'" Minn. Majority, 708 F.3d at 1057 (quoting Perry Educ. Ass'n, 460 U.S. at 49). Such a restriction "need not be the most reasonable or the only reasonable limitation" to be permissible. Cornelius, 473 U.S. at 808.

The Policy imposes the following restrictions on "public communications":

> Leafleting, signature gathering, promotional material distribution, merchandise sales, and picketing are only allowed within the Arena and the non-public forum exterior Arena areas at the request of [an Arena Tenant], the Tenant's contractual entity and/or the artists or productions they represent.

We agree with the district court that the Policy is viewpoint neutral on its face, broadly prohibiting specific expressive activity inside the Arena and the Policy Zone without regard to the content of the speech. See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Ball does not challenge this conclusion, arguing instead that the Policy is not viewpoint neutral as applied to him because it was enacted specifically to target him and his message and because he is the only individual against whom the Policy has been enforced. He notes that Appellees have allowed political messages and merchandise to be displayed and distributed in the Plaza Area during certain Arena events. The evidence establishes that Ball has been the only individual to violate the Policy and, thus, the only individual to be cited therefor. Other demonstrators and protestors have complied with the Policy and have not been cited. The evidence also establishes that any political speech that has occurred in the Plaza Area has been in connection with an Arena Tenant's use of the facility and therefore permissible under the Tenant's lease. Accordingly, Ball and his message have not been targeted by the Policy's enforcement.

-18-

Ball also argues that the Policy is not a reasonable restriction in light of the Plaza Area's intended use and purpose. In New Jersey Sports & Exposition Authority, 691 F.2d at 161-62, the Third Circuit concluded that a policy restricting leafletting and solicitation in the Meadowlands sports complex was a reasonable restriction in a nonpublic forum, observing that the prohibited expressive activity could have adverse effects on concessionaire business, subject patrons to unwanted intrusion, and impede crowd movement. Id. at 162. The policy was reasonable because it was designed to address legitimate concerns relating to the operation of the sports complex. Id.

The Policy in this case is designed to address some of the same concerns, namely to prevent interference with Arena Tenants' contractual uses of the Plaza Area and to facilitate safe and efficient access to the Arena for patrons of the venue. The Plaza Area, which is specifically included in the premises leased by Arena Tenants, is used by Tenants for commercial purposes. Restricting expressive activity in the Plaza Area is a reasonable manner of addressing those concerns and of furthering those purposes. Although Ball was at all times peaceful and respectful while leafletting, permitting such conduct within the Plaza Area amid large crowds of people intent on entering the Arena before or exiting the Arena after an event could result in an impediment to the flow of traffic and thus endanger the safety of Arena patrons. See Powell v. Noble, 798 F.3d 690, 701 (8th Cir. 2015). Viewed in light of the commercial and safety purposes served by the Plaza Area, the expressive activity Ball seeks to engage in would be disruptive of the normal activities within the Plaza Area.

The availability of nearby areas open for expressive activity also supports a finding that the Policy is reasonable. "The reasonableness of a restriction on access is supported when 'substantial alternative channels' remain open for the restricted communication." Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist., 640 F.3d 329, 335 (8th Cir. 2011) (quoting Perry Educ. Ass'n, 460 U.S.

at 53).  The Plaza Area lies between the main Arena entrance and the Haymarket district.  The Policy does not deprive Ball of access to his desired audience—the large crowds that bottleneck at the Arena doors—for Ball need only stand on the public sidewalk directly adjacent to the Plaza Area to communicate with those persons before they reach the congestion point.  The district court did not err in concluding that the Policy is reasonable and thus constitutional as not unduly restrictive of Ball's First Amendment rights to engage in expressive activity in a nonpublic forum.

Ball has not pointed to "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation."  Mann, 497 F.3d at 825 (citations omitted).  Considering the record as a whole, then, there is no genuine dispute as to any material fact, and thus summary judgment was properly granted to the City and SMG.

The judgment is affirmed.

MELLOY, Circuit Judge, concurring in part and dissenting in part.

The majority holds that the entire Plaza Area is a nonpublic forum and, thus, the Exterior Access and Use Policy is reasonable.  I would hold that only part of the Plaza Area is a nonpublic forum; the section of the Plaza Area directly in front of the pedestrian bridge, however, is a traditional public forum.  Accordingly, I concur in part and dissent in part.

A traditional public forum is property the government has historically kept open for public discourse, including parks, streets, and sidewalks.  See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985); see also Bowman v. White, 444 F.3d 967, 975 (8th Cir. 2006).  "A traditional public forum is a type of property that 'has the physical characteristics of a public thoroughfare, . . . the objective use and purpose of open public access or some other objective use and

-20-

purpose inherently compatible with expressive conduct, [and] historical[ly] and traditional[ly] has been used for expressive conduct . . . .'" Bowman, 444 F.3d at 975 (alterations in original) (quoting Warren v. Fairfax Cty., 196 F.3d 186, 191 (4th Cir. 1999)). A nonpublic forum, in contrast, is "[p]ublic property which is not by tradition or designation a forum for public communication." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983).

Based on the physical characteristics and the traditional and objective use of the Plaza Area, and the government's intent with respect to the Plaza Area, see Bowman, 444 F.3d at 978, the facts of this case show that the Plaza Area cannot be labeled as only one type of forum. Although a majority of the Plaza Area surrounding the entrance to the Arena is a nonpublic forum for the reasons discussed by the majority, the Plaza Area leading from the pedestrian bridge to the sidewalk is a traditional public forum.

To the east of the Arena, there is a pedestrian bridge that is held open to the public. The bridge feeds directly into the Plaza Area; there is no separation between the bridge and the Plaza Area. The bridge is commonly used to access the Haymarket district and to move between the baseball stadium, the Arena, and the Haymarket district. The bridge also connects to a parking lot regularly held open to the public. The public can park in the lot and walk over the bridge and must walk through the Plaza Area to get to the Haymarket district.

Discussing the physical features of the Plaza Area, the majority notes, *ante*, at 13, that "[t]he surface of the Plaza Area is composed of colored and patterned concrete, as well as by brick-like pavers, all of which generally distinguish the Plaza Area from the adjacent public sidewalks." True, the Plaza Area does have colored and patterned concrete and brick-like pavers. However, the colored concrete and pavers do not clearly distinguish the part of the Plaza Area that is open to the public. Rather, a review of the images submitted shows that the colored concrete is not

limited to the Plaza Area; the colored concrete continues past the bollards onto the public sidewalk.

Further, an individual using the pedestrian bridge must cross through the Plaza Area to reach the rest of the Haymarket district. The majority, *ante*, at 12, states, "Although the pedestrian bridge ends near the Plaza Area, pedestrians need not enter or pass through the Plaza Area to access other areas of the Haymarket district." The majority reaches this conclusion because the Policy excludes a strip of land along the edge of the Plaza Area that pedestrians are permitted to walk on to access the Haymarket district. But there are no physical markers or barriers to indicate that such a perimeter exists. Rather, to indicate this perimeter, the Policy super-imposes an orange line on pictures of the Plaza Area. And the colored concrete the majority says distinguishes the Plaza Area from the public sidewalk does not align with this perimeter. In fact, the image included with the Policy itself shows that the path excluded from the Policy includes both the colored and uncolored concrete.

A close look at the image in the majority opinion, *ante*, at 5, may be helpful. In the upper right corner of the image there are two parallel lines, one of which runs along the perimeter line. The space between those lines is the pedestrian bridge. As the image shows, the perimeter is almost flush with the end of the bridge. To avoid the Plaza Area covered by the Policy, one must turn and walk to the left immediately upon exiting the bridge.

Finally, the placement of the colored concrete supports a finding that the section of the Plaza Area leading from the bridge to the sidewalk is a traditional public forum. There is a strip of colored concrete where the bridge meets the Plaza Area that is the same width as the bridge. That colored concrete leads across the Plaza Area to the sidewalk. In Hodge v. Talkin, 799 F.3d 1145, 1158 (D.C. Cir. 2015), the court explained that the Supreme Court plaza was architecturally integrated with the Supreme Court building and, "[f]rom the perspective of a Court visitor (and

also the public), the physical and symbolic pathway to [the Supreme Court] chamber begins on the plaza." (second alteration in original) (citation and internal quotation marks omitted). By contrast, here, from the perspective of a pedestrian using the bridge, the colored concrete acts as a "physical and symbolic pathway" to and from the sidewalk.

Although I would hold that this section of the Plaza Area has the physical characteristics of a public forum, "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." Bowman, 444 F.3d at 978 (alteration in original) (quoting United States v. Grace, 461 U.S. 171, 177 (1983)). I do not disagree with the majority, *ante*, at 15, that "the Plaza Area is used as the forecourt or entryway to the Arena, and it facilitates patrons' safe and efficient passage into and out of the Arena," or that it "serves as additional commercial space for use by Arena Tenants." I would, however, limit those conclusions to the Plaza Area between the Arena and the west side of the bridge and the strip of colored concrete.

It is undisputed that people who use the pedestrian bridge also use the Plaza Area. And, in his deposition, Tom Lorenz, an SMG official, stated that the Plaza Area can be used regularly by the public for purposes other than entering and exiting the Arena. Additionally, it is undisputed that the pedestrian bridge is open to the public and meant to connect the parking lot to the Arena and the Haymarket district. Finally, it is undisputed that pedestrians must cross at least part of the Plaza Area to reach the street. As such, the Plaza Area invites the public to pass through and "operate[s] as a public artery." See Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec., 311 F.3d 534, 552 (2d Cir. 2002). Further, the Plaza Area is used in the manner cited by the majority only during events, while public passage through the Plaza Area occurs whenever people park in that parking lot to go to the Haymarket district. As a result, it is difficult to conclude that the *entire* Plaza Area's primary purpose is for Arena use.

-23-

Finally, considering the City's intent, purpose, and policy, the majority, *ante*, at 16, states that "the record establishes that the City's principal purpose with respect to the Plaza Area has been to protect the contractual rights of Arena Tenants, to allow for crowd management and safety, to provide a forecourt or gathering place for Arena patrons, and to provide an area for security screening." I disagree. The first instance of the Plaza Area being used for security screening was in February 2016, nearly three years after the Arena opened. Additionally, as previously noted, the pedestrian bridge was intended to connect pedestrians to the Arena and the Haymarket district, the only way to get from the bridge to the Haymarket district is to cross through at least part of the Plaza Area, and both the bridge and the sidewalk along the Plaza Area are public. Thus, the logical inference is that the City intended that at least part of the Plaza Area be incorporated into the "transportation grid and . . . open to the public for general pedestrian passage." United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, 383 F.3d 449, 452 (6th Cir. 2004).

Based on the foregoing discussion, I would hold that the part of the Plaza Area between the pedestrian bridge and the sidewalk is a traditional public forum. I agree with the majority as to the rest of the Plaza Area.

Because I would hold that the part of the Plaza Area between the pedestrian bridge and the sidewalk is a traditional public forum, I turn to the question of whether the Policy is permissible with respect to that part of the Plaza Area. I agree with the majority that the Policy is reasonable with respect to the part of the Plaza Area I would hold to be a nonpublic forum. In a traditional public forum, however, we apply a different level of scrutiny and the government's ability to restrict speech is the most limited. Bowman, 444 F.3d at 975. Strict scrutiny applies to content-based restrictions: the regulation must be necessary to serve a compelling state interest and be narrowly tailored to that interest. Id. Alternatively, a content-neutral, time, place, or manner restriction must be "narrowly tailored to serve a significant government interest and leave[ ] open ample alternative channels of communication." Id.

-24-

I agree with the majority, *ante*, at 18, "that the Policy is viewpoint neutral on its face, broadly prohibiting specific expressive activity inside the Arena and the Policy Zone without regard to the content of the speech." Thus, with respect to the part of the Plaza Area I would hold is a public forum, the Policy will pass constitutional muster if "the factual situation demonstrates a real need for the government to act to protect its interests." Johnson v. Minneapolis Park & Rec. Bd., 729 F.3d 1094, 1099 (8th Cir. 2013) (quoting Ass'n of Cmty. Orgs. for Reform Now v. St. Louis Cty., 930 F.2d 591, 595 (8th Cir. 1991)). "In other words, it is not enough for the [government] to recite an interest that is significant in the abstract; there must be a genuine nexus between the regulation and the interest it seeks to serve." Id.

Appellees contend that the Policy is narrowly tailored to serve three interests: (1) to prevent sales and solicitations that compete with tenants' use of the Plaza Area; (2) to ensure safety and crowd management; and (3) to keep the Plaza Area open for security screening.

"In the abstract, controlling crowds can constitute a significant governmental interest that bears directly on public safety." Id. at 1100; see also Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981) ("Because the Fair attracts large crowds, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration. As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." (citation omitted)). Appellees, however, have presented little evidence that prohibiting solicitations and public communications furthers that interest. It is true that certain events at the Arena draw crowds of 12,000 to 15,000 people. However, the assertion that the expressive activities restricted by the Policy cause congestion near the entrance to the Arena is insufficient. See Johnson, 729 F.3d at 1100. Appellees have not submitted any evidence that individuals handing out leaflets have

actually caused increased congestion. Additionally, Ball would not have violated the policy if he stood in the Plaza Area and preached at the crowd without also passing out leaflets. And the Plaza Area remains open to the public during events at the Arena. Cf. id. (citing Saieg v. City of Dearborn, 641 F.3d 727, 737 (6th Cir. 2011) (concluding that city's interest in curtailing expression on sidewalks was "not substantial," where sidewalks remained open to the public during a festival, and were not restricted to attendees paying an admission fee)).

Further, the Policy is underinclusive. "Where a regulation restricts a medium of speech in the name of a particular interest but leaves unfettered other modes of expression that implicate the same interest, the regulation's underinclusiveness may 'diminish the credibility of the government's rationale for restricting speech in the first place.'" Id. (quoting City of Ladue v. Gilleo, 512 U.S. 43, 52 (1994)). In this case, the Policy does not prohibit an individual from standing in the Plaza Area and preaching. Nor does it prohibit street performers from performing in the Plaza Area. Arguably, these activities are more likely to draw crowds than someone passing out literature. See id. at 1101 ("We think it obvious, however, that a street performer's very purpose is to draw a crowd. Buskers like mimes, musicians, and living statues aim to attract an audience, and passersby must stop to listen or observe. With literature distribution, by contrast, a recipient 'need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand.'" (quoting United States v. Kokinda, 497 U.S. 720, 734 (1990) (plurality opinion))).

Finally, the Policy is not narrowly tailored because solicitations and public communications are prohibited in the Plaza Area at all times; the Policy does not restrict those expressive activities solely when there is an event at the Arena. The Policy would be more narrowly tailored to serve Appellees' stated interests if it applied during events only.

As a result, I would hold that the Policy does not pass constitutional muster with respect to the part of the Plaza Area between the pedestrian bridge and the Haymarket district. The fact that there are alternative channels of communication, including the sidewalk just outside the Plaza Area, cannot cure the Policy's underinclusiveness and failure to be narrowly tailored. Accordingly, I would affirm the district court in part, and reverse and remand in part.

_____