Robert F. Rossiter, Jr., United States District Judge
This matter is before the Court on defendant Washington International Insurance Company's ("Washington") Motion for Summary Judgment (Filing No. 20) pursuant to Federal Rule of Civil Procedure 56. With jurisdiction in this diversity *829 case under 28 U.S.C. § 1332(a)(1), the Court grants the Motion.
I. BACKGROUND
On February 12, 2016, the Nebraska Public Power District ("NPPD") entered into a contract ("Contract") with general contractor JEL Management, LLC's ("JEL") for the construction of a permanent modular office building at the Cooper Nuclear Station in Brownville, Nebraska. The Contract required JEL to provide a surety bond "for the faithful performance and fulfillment of the contract." See Neb. Rev. Stat. § 52-118 et seq. On March 8, 2016, JEL, as principal, and Washington, as surety, executed a performance bond ("Washington Bond") in the amount of $1,246,907 under which Washington agreed to secure JEL's faithful performance of the Contract and "the payment of all laborers and mechanics for labor that shall be performed and for the payment for material and equipment rental which is actually used or rented in the erecting, furnishing, or repairing" the building. Washington further agreed that "no change, extension of time, alteration or addition to the terms of the Contract, or to the work to be performed thereunder, or the specifications accompanying the same [would] in any way affect its obligations on this bond."
In March 2016, JEL and Wallmasters Modular, Inc. ("Wallmasters") entered into a purchase order agreement ("Subcontract") under which Wallmasters agreed to deliver a modular building to the site for $730,500.[1] Wallmasters, in turn, entered into a purchase contract with Builders Choice, LLC ("Builders Choice") under which Builders Choice would perform almost all of Wallmasters's scope of work under the Subcontract.
The Subcontract required Wallmasters to obtain a performance bond and a payment bond in the penal sum of $730,500. On March 14, 2016, Wallmasters, as contractor, and plaintiff State National Insurance Company, Inc. ("State National"), as surety, executed the required bonds ("State National Bonds") for the benefit of JEL in the amount of $730,500. Under the State National Bonds, Wallmasters and State National generally bound themselves to JEL "to pay for labor, materials and equipment furnished for use in the [Subcontract]" and for the performance of the Subcontract.
Those bonds were not the first State National had executed on Wallmasters's behalf. Before January 19, 2016, Wallmasters asked State National to execute bonds to guaranty Wallmasters's performance and payment in relation to other construction contracts. State National saw Wallmasters as a risk and would not provide any payment or performance bonds without certain protections. To that end, State National required Wallmasters to use State National's contract administrator, Cinium Risk Management, LLC ("Cinium"), under the terms of a Master Project Accounting Agreement ("MPAA") effective January 19, 2016. JEL was not a party to the MPAA.
The MPAA was "deemed to apply to all construction projects and contracts for which" State National was to provide surety bonds. "As an express condition precedent to" State National issuing such bonds, the MPAA required that Cinium be used to administer all payments for Wallmasters's work. Under the MPAA, Wallmasters *830 agreed to direct the obligee under any State National bond to issue all payments to Cinium. The direction took the form of an Irrevocable Directive of Draw Proceeds ("IDDP"). The purpose of the arrangement was to protect State National from bond claims and ensure the laborers and suppliers on Wallmasters's contracts were paid.
On March 14, 2016, Wallmasters executed an IDDP directing JEL to make all payments for the NPPD project to Cinium. Lance Herrman ("Herrman"), JEL's Director of Operations, countersigned the IDDP, certifying JEL's agreement to comply with the directive. The IDDP stated it was "not intended as an assignment of the [Subcontract]" and did not amend or alter Wallmasters's obligations. State National issued the State National Bonds upon receipt of the executed IDDP.
On April 6, 2016, Wallmasters sent JEL an invoice for $730,500 and a Conditional Waiver and Release on Progress Payment indicating that payment should be made to Wallmasters. In a related email exchange the next day, Herrman, adopting Wallmasters's language, indicated the invoice "for 730,500.00 less 10% retainage is approved the expected payment date for this invoice is 06/10/2016 and will be paid to Cinium Risk Management LLC on behalf of Wallmasters Modular Inc. as per the IDDP agreement." When Cinium asked Herrman on June 17, 2016, when it could expect payment, Herrman responded that JEL could not pay until all of the modular units were delivered.
As the project moved forward, JEL issued two change orders to Wallmasters, first adding $81,795 to the Subcontract price and then deducting $37,359.58. Based on those change orders, Washington sets the final Subcontract price at $774,935.42.
On August 18, 2016, JEL issued a check to Wallmasters for $24,000. On September 7, 2016, JEL sent Wallmasters a Partial Lien Release form. Wallmasters signed and returned the release to JEL as instructed and sent JEL another invoice. The next day, Wallmasters sent payment information for a Wallmasters account at U.S. Bank. Later that day, a JEL affiliate wired $657,450[2] to Wallmasters's account. JEL soon realized the payment should have been made to Cinium. On October 25, 2016, JEL notified Wallmasters that further payments due to Wallmasters would be made to Cinium. JEL and its affiliate later requested a return of the wire to Wallmasters but were unsuccessful.
On October 26, 2016, Wallmasters told Cinium it would forward the funds it had received directly to Cinium, but it never did. Wallmasters also never paid Builders Choice, which had delivered and installed the modular building at the NPPD site pursuant to its agreement with Wallmasters.
On December 8, 2016, Builders Choice made a claim against the State National payment bond in the amount of $912,436. State National paid Builders Choice $730,500 in "full settlement of [its] claim against Wallmasters." State National took a General Release & Assignment from Builders Choice under which Builders Choice assigned "all of its rights, title and interest against any person or person which may be liable to [Builders Choice], including but not limited to Wallmasters and JEL, for any labor, materials and/or services provided by" Builders Choice for the NPPD project.
On January 4, 2017, Cinium and State National filed suit in the District Court of Nemaha County Nebraska against Wallmasters *831 and JEL alleging breach of contract against each defendant.[3] On January 9, 2017, Wallmasters filed for bankruptcy. State National and Cinium filed a claim in the bankruptcy proceedings for the initial Subcontract amount of $730,500. They also moved for relief from the automatic stay to allow them to pursue their claims against JEL. In granting relief, the bankruptcy court decided Wallmasters had no interest in any retainage held by JEL because "any such sum is held in trust for the benefits of [Cinium and State National] and/or because [they] are subrogated to any rights of [Wallmasters] in any Retainage."
On August 30, 2017, JEL wired $93,485.42 to Cinium for the benefit of Wallmasters. Adding that payment to the two JEL previously made to Wallmasters, Washington maintains JEL has fully paid the Subcontract price of $774,935.42.
Noting Wallmasters did not sign either change order and affirmatively disputed the back charges in the second change order, State National maintains there is a genuine dispute as to the final Subcontract price and whether JEL has paid in full. With respect to the JEL's $24,000 check, State National questions whether the payment is related to the NPPD project and reports the payment does not show up in JEL's accounting records.
On June 5, 2017, State National filed suit against Washington in the District Court of Nemaha County Nebraska. On June 26, 2017, Washington removed the case to this Court (Filing No. 1). A week later, Washington moved to dismiss for failure to state a claim (Filing No. 7).
On July 24, 2017, State National filed an Amended Complaint (Filing No. 9) asserting two causes of action: a claim against the Washington Bond and a claim for contribution. Washington answered (Filing No. 11) the Amended Complaint and withdrew its Motion to Dismiss.
On October 5, 2017, Washington moved for summary judgment (Filing No. 20), arguing fundamental principles of suretyship and sub-suretyship warrant judgment in its favor. See, e.g., A & P Sheet Metal Co. v. Edward Hansen, Inc. , 140 N.J.Super. 566, 357 A.2d 37, 42-44 (1976) (discussing Restatement of Security §§ 146, 147 (1941) ). Washington argues State National cannot enforce the Builders Choice assignment against Washington because State National, as surety for Wallmasters, is the principal surety for the Builders Choice claim and has the primary obligation to pay the claim. See id. at 44 ("[W]here the default of one principal imposes liability on the other the surety of the defaulting principal should bear the primary responsibility."); Irish v. Woods , 864 N.E.2d 1117, 1122 (Ind. Ct. App. 2007) (analyzing Restatement (Third) of Suretyship & Guar. §§ 53, 57, 59 (1996) ). In Washington's view, Washington is a sub-surety with only secondary obligations and State National "has no right to seek recovery from" Washington. See Irish , 864 N.E.2d at 1122.
State National rejects Washington's suretyship analysis and argues genuine disputes of material fact preclude summary judgment. See Fed. R. Civ. P. 56(a). Neither party has requested a jury trial on any matter.
II. DISCUSSION
A. Standard of Review
In reviewing Washington's motion for summary judgment, the Court views the *832 facts in the light most favorable to State National and gives it "the benefit of all reasonable inferences that can be drawn from the record." Minnesota ex rel. N. Pac. Ctr., Inc. v. BNSF Ry. Co. , 686 F.3d 567, 571 (8th Cir. 2012). Summary judgment is required if Washington "shows that there is no genuine dispute as to any material fact and [Washington] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
"A party cannot defeat a summary judgment motion by asserting 'the mere existence of some alleged factual dispute between the parties'; the party must assert that there is a 'genuine issue of material fact.' " Quinn v. St. Louis County , 653 F.3d 745, 751 (8th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson , 477 U.S. at 248, 106 S.Ct. 2505. A fact is material if, under the governing substantive law, see id. ,"it must inevitably be resolved and its resolution will determine the outcome of the case." To v. U.S. Bancorp , 651 F.3d 888, 892 (8th Cir. 2011).
"Even if some factual dispute exists, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party." Ball v. City of Lincoln , 870 F.3d 722, 727 (8th Cir. 2017). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Koehn v. Indian Hills Cmty. Coll. , 371 F.3d 394, 396 (8th Cir. 2004).
B. Substantive Law
The parties agree that Nebraska substantive law applies in this diversity case. See Erie R. Co. v. Tompkins , 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "[W]here state courts have not decided a particular substantive legal issue of relevance, [the Court] must try to predict how the state's highest court would do so and decide the case accordingly." Lindholm v. BMW of N. Am., LLC , 862 F.3d 648, 651 (8th Cir. 2017). The Court will "follow decisions of the intermediate state court when they are the best evidence of [Nebraska] law." Friedberg v. Chubb & Son, Inc. , 691 F.3d 948, 951 (8th Cir. 2012).
C. State National's Claim Against the Washington Bond
State National asserts two causes of action against Washington: a claim against the Washington Bond and a claim for contribution. Although the Amended Complaint briefly mentions both subrogation and assignment as possible bases for State National's claim against the Washington Bond, see, e.g., Krohn v. Gardner , 248 Neb. 210, 533 N.W.2d 95, 98 (1995) (drawing a clear "distinction between an assignment and subrogation"), in its brief in opposition, State National makes clear its "First Cause of Action ... arises exclusively out of the Builders Choice claim on the [Washington] Bond" and "is based upon [Builders Choice's] contractual assignment [of that claim to State National], not equitable subrogation." Insisting this is a simple assignment claim that "does not even arise out of the surety relationship," State National dismisses Washington's discussions of suretyship, sub-suretyship, and subrogation as "irrelevant, or only tangentially relevant" to State National's claims. In State National's view, it "is merely standing in the shoes of Builders Choice to bring a claim against [Washington] under the [Washington] Bond."
Washington counters that State National's assignment claim fails under Nebraska law because State National, "as Wallmaster's [sic] surety, had a duty to pay parties that Wallmasters failed to pay *833 as required by the subcontract." In support, Washington relies on Krohn , in which the Nebraska Supreme Court explained "an assignment involves a transfer of a legal claim from an injured party to a volunteer who was under no pre-existing duty to compensate the injured party." 533 N.W.2d at 98 (emphasis added) (quoting Milbank Ins. Co. v. Henry , 232 Neb. 418, 421, 441 N.W.2d 143 (1989) ). In contrast, "[s]ubrogation is substitution of one person who is not a volunteer , a subrogee, for another, a subrogor, as the result of the subrogee's payment of a debt owed to the subrogor so that the subrogee succeeds to the subrogor's right to recover the amount paid by the subrogee. " Ehlers v. Perry , 242 Neb. 208, 494 N.W.2d 325, 334 (1993) (emphasis added); see also Am. Nat'l Bank v. Clark , 12 Neb.App. 222, 670 N.W.2d 484, 487 (2003) (noting "a surety suing to recover after paying a judgment can recover from his or her principal only the amount the surety paid to satisfy the judgment").
Washington finds further support in Employers Reinsurance Corporation v. Santee Public School District No. C-5 , in which the Nebraska Supreme Court explained "an insurer cannot defeat the law of subrogation by taking an assignment against its insured." 231 Neb. 744, 438 N.W.2d 124, 130 (1989). Although that case involved insurance, the court cited three surety cases as legal support for that conclusion. See id. In particular, the court cited Meyers v. Bank of Am. Nat'l Tr. & Sav. Ass'n , 11 Cal.2d 92, 77 P.2d 1084, 1085 (1938) (en banc), for the proposition "that where by the application of equitable principles a surety has been found not to be entitled to subrogation, an assignment will not confer on the surety the right to be so substituted in an action at law upon the assignment." Id.
Washington contends State National "could not take an assignment because of its primary duty to pay Builders Choice as the surety for Wallmasters and because the payment to Builders Choice extinguished the debt-Builders Choice upon payment had no claim against [Washington] that it could assign." In Washington's view, State National "did not make a voluntary payment that might entitle it to take an enforceable assignment from Builders Choice against" Washington-it paid the Builders Choice claim as required by the State National payment bond issued for JEL's benefit. According to Washington, "Nebraska law will not enforce an assignment that gives a surety or insurer greater rights than they can assert through subrogation" because "allowing the sub-contractor's surety to enforce such an assignment would eliminate the very protection sought by the general contractor (and the general contractor's surety) in requiring the sub-contractor [to] obtain a bond," rendering the sub-contractor's bond "meaningless."
The Court agrees with Washington that-in light of State National's pre-existing duty to pay the Builders Choice claim as surety for Wallmasters-the Nebraska Supreme Court would not recognize State National's proposed assignment claim against Washington under the circumstances of this case. The parties have not cited-and the Court has not found-a Nebraska case squarely addressing the issue in this case. But analogous authority from the Nebraska Supreme Court suggests that court would apply its distinction between assignment and subrogation in the surety context and reject State National's claim. In this Court's view, it makes sense to apply the rationale underlying that distinction and the volunteer requirement to this situation where a sub-contractor's surety compelled to make payment on under its payment bond seeks to recover not from its own principal, but from the surety of the owner and beneficiary of the very surety bond that compelled the sub-contractor's *834 payment in the first place. Cf. Sawyer v. State Surety Co. , 251 Neb. 440, 558 N.W.2d 43, 47 (1997) ("The liability of the surety for the debt to the holder of the obligation is no greater and no less than that of the principal. ").
State National neither challenges Washington's reliance on the voluntary-payment requirement, nor argues State National's payment to Builders Choice as Wallmasters's surety was somehow voluntary.[4] Rather, State National asserts it "is not aware of any Nebraska case holding that a surety cannot take an assignment from a claimant after paying a claim." That superficial oversimplification ignores thorny issues raised by State National's novel proposed assignment claim against the Washington Bond under the unusual circumstances of this case.
State National characterizes this as "a simple and straightforward case involving the valid assignment of a claim" but cites to no authority from Nebraska or elsewhere recognizing the right of a sub-contractor's surety to make a claim payment under a payment bond, take an assignment of the underlying claim, and then pursue that claim against the general contractor (or its surety), even though the general contractor is the named owner and beneficiary under the sub-contractor's surety bond. But see Cont'l Cas. Co. v. Hartford Acc. & Indem. Co. , 243 Cal.App.2d 565, 52 Cal.Rptr. 533, 537 (1966) ("As a general rule, if a subcontractor's bond is put up in order to indemnify the prime contractor for any claim for which the latter may be held liable and for the payment of which the subcontractor is primarily liable, the subcontractor's surety is required to indemnify the principal contractor (or the latter's surety) for any liability imposed upon him for labor and materials furnished to the subcontractor.")
Under the State National Bonds, State National generally bound itself to JEL "to pay for labor, materials and equipment furnished for use in the [Subcontract]." State National also generally agreed to "defend, indemnify and hold harmless [JEL] against a duly tendered claim, demand, lien or suit." State National's novel theory of recovery under the Washington Bond would undermine the principles of surety law and deprive JEL and Washington of the protection JEL demanded by requiring Wallmasters to obtain the State National Bonds. Cf. Employers Reinsurance Corp. , 438 N.W.2d at 129 (rejecting a rule that would allow an insurer "to recover from its insured for the very risk the insurer contracted to protect the insured against"); A & P Sheet Metal , 357 A.2d at 44 (explaining "the very nature and purpose of the bond which the general contractor has required from the subcontractor" for the general contractor's protection warrants imposing primary liability on the sub-contractor's surety).
Washington is entitled to summary judgment on this claim under Nebraska law.
D. Contribution
State National's second cause of action is a claim for contribution. Under Nebraska law, contribution involves the sharing of the cost of a loss between parties who share a common liability to the same person. See, e.g., *835 United Gen. Title Ins. Co. v. Malone , 289 Neb. 1006, 858 N.W.2d 196, 212 (2015). "[A] claim for contribution arises when a party has paid more than its fair share of a common liability that is allocated in some proportion between itself and another party." Id. at 213.
State National's contribution claim against Washington is predicated on its contention that JEL and Wallmasters intended for the IDDP to modify and become part of the Subcontract-a contention State National acknowledges presents "a question of law" in this case. See, e.g., Terry D. Whitten, D.D.S., P.C. v. Malcolm , 249 Neb. 48, 541 N.W.2d 45, 47 (1995) ("When neither the terms of a contract nor facts and circumstances demonstrating the intent of the parties are disputed, construction of a contract is a question of law."); NJI2d Civ. 15.28 ("Whether particular facts amount to modification is a question of law.... So, where the evidence is undisputed, modification is entirely a question for the court.") (citing 17 Am. Jur. 2d Contracts § 510 (2004) ). As State National sees it, Washington, as JEL's surety, should share the cost of Builders Choice loss with State National because "the evidence demonstrates that the IDDP modified the Subcontract, and JEL breached the Subcontract, as modified by the IDDP," by failing to pay Cinium directly.[5]
In arguing the IDDP modified the Subcontract, State National relies on the following general principles of contract law.
Parties to an existing contract may, by mutual assent, modify their contract, and the modification can be proved by an explicit agreement to modify or by the actions and conduct of the parties, so long as the intention to modify is mutual and clear.
A subsequent agreement modifying the original contract may be shown by circumstantial, as well as direct evidence. The evidence in support of the modifying agreement must not be vague, ambiguous, or contradictory, but it need not be uncontroverted, or uncontradicted, or established beyond a reasonable doubt.
17B C.J.S. Contracts § 979 (footnotes omitted). State National also notes the Subcontract "does not contain an integration clause that states the Subcontract is a complete and exclusive statement of the terms of the agreement" and "does not contain any restrictions on how it can be modified." See Neb. U.C.C. § 2-202.
With that in mind, State National contends "the terms of the two controlling documents, namely the IDDP and the Subcontract," make it "clear that the IDDP provided consistent supplemental terms for or otherwise modified the Subcontract." More specifically, State National asserts "the IDDP merely supplements the Subcontract by providing a specific method of payment to the Subcontractor." State National also emphasizes some of the circumstances surrounding the execution of the IDDP, including that the IDDP involved the same parties as the Subcontract, was executed about ten days after the Subcontract, and was a condition to State National issuing any bonds for Wallmasters. Finally, State National argues "JEL's own actions demonstrate that it believed the IDDP was an enforceable agreement between JEL and Wallmasters, for the benefit of [Cinium] and State National." State National's modification arguments are unavailing.
To begin, the IDDP contains no explicit agreement that the IDDP was intended to *836 modify or become part of the Subcontract. State National asserts "[t]he language of the IDDP is more than sufficient to demonstrate an intention of the parties to supplement or modify the terms of the Subcontract" but does not follow that assertion with any examples of language from the IDDP that make the parties' mutual intention so clear. The language State National does discuss-like most of its other circumstantial modification evidence-is vague, ambiguous, and contradictory.
Rather than compelling the conclusion that the IDDP became part of the Subcontract, a closer look at the IDDP and the surrounding circumstances, on balance, suggests the opposite. The IDDP is framed not as an amendment or modification of the terms of the Subcontract but as a directive from Wallmasters to JEL, subject to JEL's certification of its agreement to comply. The IDDP speaks of the Subcontract as a separate and distinct agreement. It clarifies that "nothing in this directive amends or alters any of [Wallmasters's] obligations under the [Subcontract]" and "deems" payments made to Cinium as payments to Wallmasters under the Subcontract. What's more, the letter Cinium sent JEL to induce JEL to "acknowledge" the IDDP stated that although payments should be sent to Cinium, the IDDP "does not ... alter the project contract."[6]
State National is correct that the IDDP does not say "it should not be construed to alter JEL's required method of payment under the Subcontract" and that JEL agreed to comply with Wallmasters's payment directive by signing the IDDP. But those facts are not strong evidence of a clear and mutual intention to make the IDDP part of the Subcontract. The same is true for JEL's actions after signing the IDDP. That JEL treated the IDDP as an enforceable agreement says nothing about its intent to make the payment directive part of the Subcontract.
After careful review, the Court concludes State National's proffered evidence is insufficient to establish a clear and mutual intention to make the IDDP part of the Subcontract and bring it within the Washington Bond. As such, State National's claim for contribution against Washington based on JEL's purported breach of the Subcontract fails as a matter of law.[7] See, e.g., *837 Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (explaining summary judgment is proper if the nonmovant fails "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof").
E. Alleged Factual Disputes
State National last argues summary judgment is unwarranted because "there is a genuine dispute of material fact as to the actual amount of the Subcontract, and the amount that JEL actually paid to Wallmasters under the Subcontract." The Court disagrees. Though there may be a genuine dispute as to those facts, State National fails to articulate how those disputed facts are material to its assignment and contribution claims against Washington based on the Builders Choice claim. The final amount of the Subcontract and the amount JEL paid might be material to a claim to the retainage or otherwise based on the Subcontract, but the Court fails to see how those facts necessarily determine the outcome of this case as pled. See, e.g., Dick v. Dickinson State Univ. , 826 F.3d 1054, 1061-62 (8th Cir. 2016) (concluding "there was no genuine dispute of material fact preventing" summary judgment where the disputed facts supported claims the plaintiff did not make and "would not affect the outcome of the suit").
Based on the foregoing,
IT IS ORDERED:
1. Washington International Insurance Company's Motion for Summary Judgment (Filing No. 20) is granted.
2. State National Insurance Company, Inc.'s Amended Complaint (Filing No. 9) is dismissed with prejudice.
3. A separate judgment will be entered.

Washington does not question State National's reasonable conclusion that "the Subcontract is properly construed as a sale of goods under the Nebraska Uniform Commercial Code" because the modular building was movable at the time it was identified to the Subcontract. See Neb. U.C.C. § 2-105(1).

The amount wired equals the amount of the original invoice of $730,500 less 10% retainage.

The parties' respective submissions indicate State National's suit against JEL remains pending in state court.

Nor could it. See, e.g., Rawson v. City of Omaha , 212 Neb. 159, 322 N.W.2d 381, 385 (1982) ("One is not a volunteer when he has an interest of his own to protect. And a payment is not voluntary when made under compulsion, as where one is forced to pay the debt or claim for which another is primarily liable." (quoting 73 Am. Jur. 2d Subrogation § 24 at 613 (1974) ) ). To the contrary, State National concedes that in paying Builders Choice under the payment bond, State National "was simply carrying out the obligations consistent with its position as surety."

Washington acknowledges the Washington Bond covers JEL's obligations under the Subcontract but maintains "the IDDP is not a term or condition of the sub-contract; thus, [Washington] cannot be liable for JEL's payment of funds directly to Wallmasters."

State National summarily asserts that "where JEL and Wallmasters entered into a written agreement (the IDDP), the parol evidence rule prohibits a court from considering any prior discussions to vary the terms of the written agreement." "[T]he parol evidence rule renders ineffective any evidence of a prior or contemporaneous oral agreement which adds to, alters, varies, or contradicts the terms of" "a completely integrated written document purporting to express the terms of [an] agreement" on the same subject matter. Rowe v. Allely , 244 Neb. 484, 507 N.W.2d 293, 297 (1993) ; accord Neb. U.C.C. § 2-202 (explaining terms "set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement"). Here, the IDDP is not a completely integrated agreement or a final expression of the parties' agreement regarding modification and does not, on its face, even purport to specifically address the issue here-whether the parties intended that the IDDP would alter and become part of the Subcontract upon execution. See, e.g., Cleasby v. Leo A. Daly Co. , 221 Neb. 254, 376 N.W.2d 312, 317 (1985) (noting the court decides whether a contract is fully integrated and "the extent to which a transaction is embodied in the writing"). The parol evidence rule does not prevent the Court from considering Cinium's statement that the IDDP did not alter the Subcontract. Rowe , 507 N.W.2d at 297.

This conclusion does not leave State National without recourse as its state-court claim that JEL breached the IDDP is still pending.