# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2410
_____

William Hatcher

*Plaintiff - Appellant*

v.

MDOW Insurance Company

*Defendant - Appellee*

Wells Fargo Home Mortgage, Inc.

*Defendant*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Helena
_____

Submitted: April 11, 2018
Filed: September 7, 2018
_____

Before BENTON, MELLOY, and GRASZ, Circuit Judges.
_____

MELLOY, Circuit Judge.

William Hatcher appeals following an adverse jury verdict on his claim seeking additional insurance benefits for smoke and fire damage at his home. He argues the

district court misinterpreted his insurance policy as an actual-cash-value policy rather than a replacement-cost policy. In addition, he raises an evidentiary issue, arguing the district court improperly prevented him from testifying as to the pre-fire, depreciated value of the damaged portions of his home. We conclude his policy was an actual-cash-value policy. We also conclude Mr. Hatcher is not entitled to relief on his evidentiary claim. Mr. Hatcher testified as to a pre-fire depreciation amount, he failed to show that the court admonished the jury to disregard his testimony, he did not otherwise make an offer of proof as to what additional testimony he sought to provide, and he failed to provide a transcript of the final day of trial. We affirm the judgment of the district court.

I.

Mr. Hatcher's home was damaged by smoke and fire in 2015. He and his son had built the home together approximately twenty years prior to the fire. Mr. Hatcher owned and lived in the home during the intervening years. The home had new kitchen appliances at the time of the fire, but many components of the home (furnace, carpet, roof, etc.) were twenty years old. The home suffered severe fire damage in some areas and smoke damage throughout more extensive areas.

Mr. Hatcher maintained casualty insurance for his home with defendant MDOW Insurance Company, renewing annually after initial issuance of the policy in January 2011. Soon after the fire, an adjuster from MDOW arrived at the scene and met with Mr. Hatcher. Mr. Hatcher indicated he wished to remain at the home during reconstruction. In fact, he had already borrowed a camper from his son, placing the camper in a carport at the damaged home. The adjuster agreed to pay a per diem for use of the camper and provided a $5,000.00 advance. Mr. Hatcher and his son commenced making repairs at the home, performing much of the tear-out and demolition work themselves and disposing of materials in a ravine on the property.

Less than one month later, the adjuster provided Mr. Hatcher with an additional $1,040.00 for living expenses.

The adjuster initially estimated the actual cash value of damage to Mr. Hatcher's home as $41,550.02. Mr. Hatcher disagreed with the adjuster's estimate and interpretation of the policy. Mr. Hatcher tendered an estimate from his brother (a contractor) for $92,895.00. He also tendered an estimate from a different, unrelated contractor for $97,080.00. In addition, he hired an attorney.

The adjuster then increased his estimate of damages to the home to $63,593.32, acknowledging that certain items he had deemed salvageable should be replaced. In November 2015, MDOW issued two checks to Mr. Hatcher's attorney: $63,593.32, representing MDOW's estimate of the actual-cash-value damages, and $12,556.77 for damage to Mr. Hatcher's personal property. In total, MDOW paid Mr. Hatcher $82,190.09.

The third-party, unrelated contractor performed repairs to Mr. Hatcher's home for the estimate amount tendered by MDOW ($63,593.32). In addition, Mr. Hatcher alleges that he and his son personally performed approximately $20,000 of additional repairs and demolition work. Ultimately, the repairs to Mr. Hatcher's home included some repairs and some upgrades. For example, Mr. Hatcher installed a metal roof (where previously there had been shingles) and hardwood floors (where previously there had been vinyl). He also replaced some twenty-year-old components with new components. But, as already noted, certain other expenses were not included in repair costs paid to the unrelated contractor because Mr. Hatcher and his family provided labor and disposed of damaged materials without charge. Moreover, some damaged components were merely repaired. In receiving the checks and making repairs, Mr. Hatcher did not agree to MDOW's estimate of damages, and MDOW did not make its payment contingent on such assent.

Mr. Hatcher commenced this action, alleging MDOW acted in bad faith. He sought punitive damages as well as additional payment under the policy for his repairs. Mr. Hatcher attached to his complaint the operative policy for 2015. The attached policy included an actual-cash-value endorsement as well as a declarations page identifying the actual-cash-value endorsement as a form attached to the policy. To a large extent, the policy attached to the complaint speaks for itself. The 2015 policy, without looking at the actual-cash-value endorsement, is a hybrid policy. Some categories of harm are covered for replacement cost, and other categories are covered only for actual cash value. The endorsement, however, expressly deletes replacement cost and applies actual cash value to all relevant coverage terms. Disputes in this case relate primarily to what was included in earlier years' versions of the policy and whether changes upon annual renewal were conducted in a manner so as to make the actual-cash-value endorsement in the 2015 policy effective.

Mr. Hatcher filed a motion for partial summary judgment, asking "that the 'actual cash value' endorsement be stricken from the contract, that the Defendant be prohibited from arguing the same to the jury in this case, and for all other fit and proper relief." He attached to his motion an affidavit and a thirty-six-page, purportedly complete copy of the "original" policy. The document he attached included no declarations page and contained no actual-cash-value-endorsement. Because he attached no declarations page to the policy accompanying his affidavit, the attachment, in fact, was merely a basic form policy. It referenced no policy period, failed to identify the insured or the insurer, referenced no limits of liability, identified no premium, and identified no deductibles. In other words, the policy attached to his affidavit was obviously incomplete. Nevertheless, he specifically stated in his affidavit that "[w]hen I purchased insurance for the house, I remember being offered the policy of insurance which is attached to this affidavit at Exhibit 'B'. It had 36 pages." He also stated in his affidavit that "[t]he endorsement must have been added after I agreed to the attached policy . . . [and that he] never agreed to change the terms from 'replacement costs' to 'actual cash value.'"

-4-

MDOW resisted Mr. Hatcher's motion and filed its own motion for partial summary judgment. In its own motion, MDOW sought a defense judgment on the bad-faith claim, characterizing its own treatment of Mr. Hatcher's insurance claim as involving good-faith disagreements as to policy interpretation and damages amounts. In resisting Mr. Hatcher's motion concerning policy provisions and in presenting its argument concerning policy interpretation as relevant to the bad-faith claim, MDOW attached affidavits, renewal-notice letters, and annual policies.

Each policy that MDOW submitted included a declarations page, and each policy included an actual-cash-value endorsement. For the three policies issued for 2011, 2012, and 2013, the declarations page included a section entitled "Additional Endorsements Attached to Policy." For these three years, the actual-cash-value endorsement was attached but not listed on the declarations page. Then, for the 2014 and 2015 policies, the corresponding section on the declaration page was renamed "Forms Attached to Policy" and the actual-cash-value endorsement was listed. MDOW also provided letters it purportedly sent to Mr. Hatcher in December 2013 as notice of renewal for the 2014 policy, and sent in 2014 for the 2015 renewal. These letters did not expressly reference the actual-cash-value endorsement as a change. They did, however, identify other changes to the policy. In addition, the letters were accompanied by declarations pages and instructed Mr. Hatcher to review the policy if he intended to renew.

The district court granted MDOW's summary judgment motion as to the bad-faith claim, rejecting three arguments by Mr. Hatcher. First, the court held Mr. Hatcher failed to create a triable question of fact regarding bad faith related to the adjuster's initial and subsequent damages estimates. Second, the court held Mr. Hatcher failed to create a triable question of fact regarding an allegation that MDOW had unilaterally altered the policy by adding the actual-cash-value endorsement. And finally, the court held MDOW had not acted in bad faith in relation to living expenses

by agreeing to pay a per diem for use of the trailer rather than paying for some other arrangements.

The case proceeded to trial, which took place over the course of three days. Late in the week prior to trial, the court held a pretrial conference at which the court addressed questions surrounding policy interpretation. Mr. Hatcher argued he should be allowed to introduce evidence of earlier years' policies to prove MDOW had added the actual-cash-value endorsement after the initial policy issuance in 2011 and to prove it had not been added in a manner so as to make it effective. The district court reserved ruling. Then, on the first day of trial, the court again took up the issue of earlier policies and the process of policy amendment. The court did so to decide whether the court would or would not allow parol evidence for the purpose of interpreting the 2015 policy as attached to Mr. Hatcher's complaint.

The court concluded the evidence was overwhelming that the annual policies had always included an actual-cash-value endorsement. The court noted the state of the record concerning this issue, indicating that, although the earlier policies did not reference the actual-cash-value endorsement on their declaration pages, Mr. Hatcher's own conclusory affidavit was the only evidence indicating such endorsements had not been included in the earlier policies. His affidavit, however, was facially infirm in that it made representations about the original policy that were patently incorrect, i.e., he represented that a thirty-six-page document with no declarations page (and therefore no listing of insurer or insured, insured amounts, insured property, deductibles, etc.) was the "original" policy. The court also determined, in the alternative, that even if the original policy had not included an actual-cash-value endorsement, the latter addition of such an endorsement at time of renewal, with Mr. Hatcher having the option to not renew, sufficed to alter the policy. The court entered a separate written order to this effect, stating its conclusion that interpretation of the applicability of the endorsement was a question of law for the court.

When the trial commenced, in light of the district court's pretrial ruling, the parties tried the issue of the fire-damage loss amount under an actual-cash-value analysis rather than a replacement-cost analysis. MDOW elicited testimony from its adjuster who was experienced in using software for calculating depreciation. Eventually, Mr. Hatcher took the stand and attempted to offer his opinion, as the property owner, regarding the pre-fire depreciation of his home. Counsel asked Mr. Hatcher, "And now, knowing that you have an actual cash value policy, how much would you depreciate the value of your home?" Mr. Hatcher answered, "No more than 10 percent." Counsel for MDOW immediately objected, and counsel for Mr. Hatcher rebutted that Mr. Hatcher was the owner of the property. The district court called the parties to a sidebar.

In the ensuing discussion, the parties disputed whether Mr. Hatcher was qualified to offer an opinion as to depreciation and whether an opinion as to depreciation in this context differed from an opinion as to value. The court concluded the sidebar, stating:

> He can give that if you want to go through and lay a foundation for him to talk about depreciation. The problem with the way you phrased your question is the value of the property subject to depreciation. I don't know – when we're talking about that, I don't know what exactly the property is. I think you could give a value as to the property. But I'm not sure what subject to depreciation means in your question for this witness.
> . . .
> I'm not sure, again, he's qualified to do the subject to depreciation. I'm not sure what he did in his past life or employment or how he would establish a value for certain values of the overall property. If you have some way he would have that foundational knowledge, you know, I think what you are asking him is slightly different than the value of his property.
> . . .

If you want to go out there and try to do it again with the witness, you can. Like I said, right now the way the question is phrased I think is objectionable, and I'll sustain the objection. You can make another run at it with a different question in an effort to try to get to where you are trying to go. I will rule on contemporaneous objections that are made.

After the sidebar, proceedings continued in open court, but the court did not inform the jury as to the ruling on the objection, and the jury was not told to disregard Mr. Hatcher's testimony that the pre-fire depreciation in the value of his home was "[n]o more than 10 percent." Subsequently, Mr. Hatcher's counsel asked a few pointed questions regarding problems or deterioration with cabinets, insulation, appliances, general wear and tear, etc. Counsel did not, however, ask Mr. Hatcher to opine again as to a depreciation amount. Counsel's questioning of Mr. Hatcher as to this topic concluded with the following:

[Counsel]: You've heard [the adjuster] testify that significant portions of your property had deteriorated over time. Can you tell the jury what portions of your property had deteriorated significantly over time?
[Mr. Hatcher]: Not anything. I had vinyl siding on the outside. It was all good, other than what the fire done. I didn't have anything.

Ultimately, the jury returned a defense verdict, rejecting Mr. Hatcher's claim that he was entitled to additional insurance proceeds. Mr. Hatcher appealed to our court and provided a transcript of the pre-trial conference that took place the week prior to trial. In addition, he provided transcripts of the first two days of trial. He did not provide a transcript of the final day of trial. The district court docket sheet, in fact, does not show that either party ordered the transcript of that day. On appeal, Mr. Hatcher argues the district court improperly interpreted the policy as an actual-cash-value policy and erred by preventing him from testifying as to the pre-fire depreciation of his home.

-8-

II.

A.

We first address Mr. Hatcher's challenge to the district court's determination that the 2015 policy included an enforceable actual-cash-value endorsement. The procedural posture surrounding the interpretation of the policy is a bit opaque. Mr. Hatcher attached the operative 2015 policy to his complaint. The parties, on their cross motions for summary judgment, developed a record to contest the contents of the 2011 policy, annual changes to the policy through the 2015 policy, and communications preceding renewals. We review summary judgment rulings de novo. Ball v. City of Lincoln, Neb., 870 F.3d 722, 726 (8th Cir. 2017). But the district court did not rule at the summary judgment stage that the operative 2015 policy was an actual-cash-value policy. Rather, the district court merely rejected Mr. Hatcher's bad-faith claim and denied his request to rule as a matter of law that the policy was a replacement-cost policy. Then, the week before trial and again at the commencement of trial, the court addressed policy interpretation and policy amendments in a context akin to ruling on a motion in limine. The court was deciding whether to allow or disallow parol evidence to challenge the actual-cash-value endorsement attached to the 2015 policy and identified on its declaration page. We normally review such evidentiary rulings for an abuse of discretion. Sims v. State Farm Mut. Auto. Ins. Co., 894 F.3d 941, 946 (8th Cir. 2018). As between these two standards, the most favorable possible standard of review we could apply from Mr. Hatcher's standpoint is de novo review. Because we affirm even under this standard, we apply de novo review.

The district court supported its decision with two lines of reasoning. First, the court looked at the materials tendered at summary judgment and referenced by the parties at the pretrial hearings and determined the annual policies had always included actual-cash-value endorsements, even if the declaration pages for 2011, 2012, and

-9-

2013 did not reference those endorsements. MDOW had tendered materials and affidavits to this effect, and they were consistent with the 2015 policy Mr. Hatcher had attached to his complaint. The only countervailing evidence Mr. Hatcher offered was his own facially infirm affidavit claiming that the partial document attached to his summary judgment affidavit comprised the entirety of the original 2011 policy. Faced with the undisputedly applicable 2015 policy Mr. Hatcher had attached to his complaint, the district court essentially found Mr. Hatcher's infirm affidavit incompetent to create a triable question of fact as to whether the earlier policies had or had not included the actual-cash-value endorsement.

Second, the court determined that, even if the actual-cash-value endorsement was first added to the policy for policy year 2014, it was added in a manner consistent with requirements under Arkansas law to provide an insured notice and opportunity to review policy amendments prior to renewal. See Ark. Code Ann. § 23-88-105.

We agree with the district court that all years' policies *contained* the actual-cash-value endorsement. Moreover, the material question for our review is whether the endorsement attached to, and referenced on the declaration page for, the 2015 policy was operative. As such, the enforceability of the endorsement for any prior year is not at issue. Rather, the other years' policies and any renewal letters as to those years are material to the extent they indicate whether Mr. Hatcher had notice of the endorsement for the 2015 policy. As such, we need not decide whether the absence of a reference to the endorsement on the declaration pages for 2011, 2012, and 2013 made the endorsement unenforceable for those years or whether the renewal letter for the 2014 policy sufficed to make the endorsement enforceable for that year.

Looking at the entirety of what Mr. Hatcher received, it is clear the 2015 endorsement was enforceable. The declaration pages for 2014 and 2015 referenced the endorsement. The letter MDOC sent to Mr. Hatcher in December 2013 inviting policy renewal for 2014 did not expressly reference the endorsement. It did, however,

reference the need to review the attached materials, which, in fact, included the endorsement and the policy with a declaration page listing the endorsement. As to the 2015 policy, Mr. Hatcher received a notice in December 2014 instructing him to review the 2015 policy if he intended to renew. Therefore, prior to renewal in 2015, Mr. Hatcher received two notice of renewal letters and was afforded approximately thirteen months to review the materials provided, including declaration pages referencing the endorsement that had been attached to his policy as far back as 2011.

The Arkansas Code addresses requirements for what an insurer is to include in a notice to a policyholder regarding changes to a policy at time of proposed renewal:

> (a) Except for nonpayment of premium, the insurer shall give either a written notice of nonrenewal or an offer of renewal at least thirty (30) days prior to the expiration of the policy's existing term.
>
> (b) The insurer shall send the insured a written notice . . . of the offer of renewal under subsection (a) of this section, indicating the new premium and providing a description of any change in deductible or policy provision in the renewal policy.

Ark. Code Ann. § 23-88-105. If the endorsement had never been attached, and if it had first appeared in the proposed 2015 policy sent to Mr. Hatcher prior to renewal, a close question might exist as to whether Mr. Hatcher received sufficient statutory notice of the change. It is by no means clear that one renewal letter accompanied by a policy with a declarations page and attached endorsement would satisfy the "description of any change" requirement listed in section 23-88-105(b). But, we cannot view the disclosures for the 2015 renewal in a vacuum. We agree with the district court that the entirety of the materials Mr. Hatcher received more than adequately satisfied the statutory requirements.

-11-

Mr. Hatcher nevertheless argues the change to his policy was without consideration. To support his argument, he cites Southern Farm Bureau Cas. Ins. Co. v. United States, 395 F.2d 176 (8th Cir. 1968), for the general proposition that consideration is required to amend policy terms. In particular, he argues that his premiums increased rather than decreased even though, according to him, the scope of his coverage decreased. We conclude he reads too much into Southern. As our court held in Slaughter v. Am. Cas. Ins. Co. of Reading, Pa., 37 F.3d 385 (8th Cir. 1994), Southern involved an "attempt[] to modify a policy during a policy period." Slaughter, 37 F.3d at 387. In fact, in Slaughter, we quoted and emphasized language from Southern to the effect that the insurer is not locked in to existing terms beyond the policy term:

> The insurance company clearly could cancel the policy upon proper notice and could if desired offer a different policy to the assured, who would be free to accept or reject the proffered policy; or *the company could refuse to renew except upon altered terms and conditions*. The company is not locked in for an extended period of time or *ad infinitum* so to speak in its contract obligations if proper steps are taken to make a new or altered contract with its assured.

Id. (quoting Southern, 395 F.2d at 181). Mr. Hatcher's premium for the 2015 policy, after receiving adequate notice, served as consideration.

B.

Turning to the evidentiary issue, we agree with Mr. Hatcher that, at trial, the district court should have overruled MDOW's objection to Mr. Hatcher's depreciation testimony. Depreciation, after all, is merely the difference between two values: an initial value and a later-in-time value. See, e.g., Nw. Nat'l Ins. Co. v. Nemetz, 400 N.W.2d 33, 40 (Wis. Ct. App. 1986) ("Replacement cost minus depreciation is a permissible method of arriving at the fair market value of lost property."). Although

-12-

various technical means of tracking and deducting depreciation exist for accounting and tax-calculation purposes, these technical means do not change the underlying fact that an opinion as to depreciation is nothing more than an opinion as to value. And, in Arkansas, a property owner intimately familiar with his property is competent to testify as to its value. See, e.g., Walt Bennett Ford, Inc. v. Brown, 670 S.W.2d 441, 443 (Ark. 1984). Testimony from a property owner, although admissible, is subject to attack and carries weight commensurate in scope with the property owner's explanation and demonstrated knowledge and experience. See Pope v. Overton, 376 S.W.3d 400, 405 (Ark. 2011) ("An owner of property is competent to testify as to value of his property if he has an intimate acquaintance with his property, but not every landowner's testimony constitutes substantial evidence."). Here, Mr. Hatcher built the home, lived in it for twenty years, and participated in the post-fire reconstruction. He was, therefore, well positioned to claim an ability to testify as to the property's value.

MDOW cites various cases seeming to limit a property owner's ability to opine as to value, but all such cases relate to unique situations not present in our case. For example, courts have limited or excluded such testimony from commercial landowners shown to be unfamiliar with their property or who sought to testify as to the value of a property as part of a larger commercial enterprise or for a particular commercial use. See, e.g., James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1214–16 (10th Cir. 2011) (excluding a commercial property owner's attempted testimony as to valuation where the property owner offered no basis in fact to explain a depreciation percentage and, in fact, was an out-of-state absentee owner who had acquired the property in a distress sale); Ark. State Highway Comm'n v. Frisby, 951 S.W.2d 305, 307 (Ark. 1997) (stating that "no doubt" an owner has the privilege of offering an opinion as to valuation, but excluding such an opinion from a commercial property owner where the owner admitted in testimony he had no basis in fact for his estimate and had merely based it on "his 'feeling' or what he would have asked for the land"); Ark. State Highway Comm'n v. Hammond, 447 S.W.2d 664, 665 (Ark.

1969) (finding landowner in eminent domain dispute could not testify as to value of commercial fish-rearing ponds or intended construction projects on land taken by the state because landowner had no basis in knowledge for such commercial valuations). We simply find no authority for the proposition that a homeowner such as Mr. Hatcher is unable to testify as to the value of his home, and by extension, depreciation over a period of time during which he built and occupied the home.

That does not end our analysis, however, because three separate grounds exist that bar Mr. Hatcher from receiving relief due to the absence of any demonstrated harm. See Stolzenburg v. Ford Motor Co., 143 F.3d 402, 406 (8th Cir. 1998) ("[W]e conclude as well that any error in excluding it was harmless."). First, as discussed above, the jury actually heard his testimony that pre-fire depreciation of his home was "no more than 10 percent." The district court ruled on the MDOW's motion only in the sidebar. The transcript provided to our court does not show that the jury was informed as to the ruling on the motion. In any event, Mr. Hatcher has not shown that the jury was admonished to disregard his depreciation testimony. Therefore, without resort to speculation, we cannot conclude the jury was even aware that the district court sustained the objection.

Second, even if the jury had been admonished to disregard that testimony, Mr. Hatcher made no offer of proof as to what additional or alternative information he wanted to tell the jury but was prevented from saying. See Strong v. Mercantile Trust Co., 816 F.2d 429, 431 (8th Cir. 1987) ("Error may not be predicated upon a ruling excluding evidence unless a substantial right of the party is affected and 'the substance of the evidence was made known to the court by offer [of proof] or was apparent from the context within which questions were asked.'" (quoting Fed. R. Evid. 103(a)(2))).

And third, Mr. Hatcher did not provide to our court a transcript of the final day of trial. Without a transcript of the final day of the trial, we cannot assess harm

-14-

because we cannot know what was said to the jury at closing regarding the parties' respective views of pre-fire value, replacement costs, depreciation, etc. See, e.g., Kelly v. Omaha Hous. Auth., 721 F.3d 560, 562 (8th Cir. 2013) (dismissing for inability to review based on plaintiff's failure to order the entire transcript where the court deemed missing transcript portions necessary); Brattrud v. Town of Exline, 628 F.2d 1098, 1099 (8th Cir. 1980) (per curiam) ("The pleadings included in the record on appeal fail to provide any record required for a meaningful review. This court cannot rule on the issues raised here without a complete transcript of the proceedings. In the absence of a proper record which includes the transcript of testimony, we have no alternative but to dismiss the appeal pursuant to Eighth Circuit Rule 13, for failure to comply with the Federal Rules of Appellate Procedure.").

Because the district court did not err in interpreting the policy as an actual-cash-value policy, and because Mr. Hatcher has shown no harm related to the evidentiary ruling on his depreciation testimony, we affirm the judgment of the district court.

_____